In the Matter of the **REINSTATEMENT OF Jon E. WIEDERHOLT,** Petitioner.

No. S–10528.

Supreme Court of Alaska.

April 23, 2004.

Rehearing Denied June 22, 2004.*

Before: MATTHEWS, FABE, and CARPENETI, Justices.

**Order**

**Petition for Reinstatement**

IT IS ORDERED:

For the reasons stated in the Disciplinary Board's recommendation entered May 12, 2003, attached to this order as Attachment A, the Petition of Jon E. Wiederholt for Reinstatement to the practice of law is DENIED.

BRYNER, Chief Justice, and EASTAUGH, Justice, not participating.

CARPENETI, Justice, dissents and would grant the petition for the reasons set forth in his attached dissenting statement.

**ATTACHMENT A**

**BEFORE THE ALASKA BAR ASSOCIATION DISCIPLINARY BOARD**

In The Reinstatement Matter
Involving
　　Jon E. Widerholt,
　　　　Petitioner.

ABA Membership No. 8312172
ABA File No. 2002R001
S–10528

Filed May 12, 2003

* Carpeneti, Justice dissents. He would grant the petition for the reasons expressed in his dissenting statement.

1. The Supreme Court's Order of referral was modified by an Order dated May 1, 2002, in which the originally stated due date for the Board's findings, conclusions, and recommendation was eliminated [R. 220].

**DISCIPLINARY BOARD'S RECOMMENDATION TO THE ALASKA SUPREME COURT**

### INTRODUCTION AND OVERVIEW

Disbarred attorney Jon E. Wiederholt ("Wiederholt") petitioned the Alaska Supreme Court for reinstatement on February 27, 2002 [R. 1—26]. On March 18, 2002, the Alaska Supreme Court referred the matter to the Alaska Bar Association's Board of Governors, sitting in its capacity as the Bar's Disciplinary Board ("the Board") [R. 29].[1] On April 19, 2002, the Bar assigned Wiederholt's petition to a hearing panel consisting of attorneys C. Alex Young and Larry D. Wood and non-attorney Debra Anderson ("the Hearing Committee") [R. 31—33].

The Hearing Committee conducted a hearing on October 8—9, 2002.[2] Wiederholt was represented by attorney Michaela Kelley Canterbury. The Bar was represented by Bar Counsel Stephen J. Van Goor and Assistant Bar Counsel Louise R. Driscoll. The Hearing Committee issued its 37 page findings of fact, conclusions of law, and recommendation on November 14, 2002 [R. 383—419]. In short, the Hearing Committee recommended that Wiederholt be reinstated to the practice of law upon certain conditions.

Pursuant to Bar Rules, the matter then was presented to the Board.[3] Bar Counsel urged the Board to reject the Hearing Committee's findings, conclusions, and recommendation; Wiederholt urged the Board to accept those findings, conclusions, and recommendation, and to forward them to the Court. The Board considered (1) the entire record from the original disbarment proceedings through the Hearing Committee's decision, including documentary evidence and transcripts of testimony, (2) the parties' briefing to the Board, (3) oral arguments by Ms. Canterbury and Mr. Van Goor at the January 23, 2003, hearing before the Board,

2. The full transcript is a part of the record, including some videotaped deposition testimony.

3. Board participants were President Lori Bodwell, presiding, public member Sheila Selkregg, and attorney members Matthew Claman, Robert Johnson, Jonathon Katcher, Keith Levy, Lawrence Ostrovsky, and Daniel Winfree.

and (4) the statements made by Wiederholt in response to Board inquiries at the January 23, 2003, hearing before the Board.

After careful consideration of the totality of the facts and circumstances of this matter, the Board does *not* agree with the Hearing Committee. The Board believes that the Hearing Committee did not afford proper weight to the history of Wiederholt's disbarment and his previous attempt to be reinstated (Findings of Fact 1—7) [R. 383—386], and the Board does not agree with the Hearing Committee's evaluation of the testimony (Finding of Fact 8) [R. 387—404]. The Board also does not agree with the Hearing Committee's conclusions that Wiederholt satisfied his burden of demonstrating by clear and convincing evidence (1) that Wiederholt has the requisite moral qualifications for reinstatement (Conclusions 3, 6—8) [R. 405—408; 410—417], (2) that Wiederholt would not repeat his misconduct if readmitted to the practice of law (Conclusions 4, 6—8) [R. 408—417], and (3) that Wiederholt's resumption of the practice of law would not be subversive to public interests, detrimental to the integrity and standing of the Bar, or detrimental to the administration of justice (Conclusions 5—8) [R. 409—417]. Accordingly, and in light of the Board's own findings and conclusions, as set forth below, the Board recommends to the Court that Wiederholt *not* be reinstated to the practice of law at this time.

### RELEVANT BAR RULES FOR THE REINSTATEMENT PROCESS

As noted in the Court's order of referral, reinstatement of a disbarred attorney is governed by Alaska Bar Rule 29. Reinstatement may not occur prior to the expiration of at least five years from the date of disbarment [Rule 29(b) ].[4]

Reinstatement proceedings follow this process:

1. A hearing committee is appointed to take evidence and issue a report (including findings of fact, conclusions of law, and recommendation on reinstatement) to the Board [Rule 29(c)(1) ];

2. The Board then reviews the record and report generated by the hearing committee and forwards to the Court its own findings of fact, conclusions of law and recommendation on reinstatement, along with the record generated by the hearing committee and the Board [Rule 29(c)(2) ]; and

3. The Court then accepts or rejects the Board's recommendations on reinstatement [Rule 29(c)(2) ].

The Rule 29(c)(2) process is automatic, and there is no need for an "appeal" from the Hearing Committee to the Board or from the Board to the Court.[5] However, Rule 29(c)(1) also notes that "appellate action" from a hearing committee report is governed by Bar Rule 25. Bar Rule 25(f)-(h) provides an "appeal" process that is, for all practical purposes, indistinguishable from the process noted in Rule 29(c)(2). In this case, Bar Counsel filed a Notice of Appeal from the Hearing Committee's report [R. 422—431].

It is critical to note that Bar Rule 29(c)(1) also sets out the fundamental considerations for a reinstatement petition, as well as the petitioner's high burden of persuasion on the petitioner's qualifications for reinstatement:

[T]he Petitioner will have the burden of demonstrating by clear and convincing evidence that (s)he has the moral qualifications, competency, and knowledge of law required for admission to the practice of law in this State and that his or her resumption of the practice of law in the State will not be detrimental to the integrity and standing of the Bar, or to the administration of justice, or subversive of the public interest[.][6]

---

4. A petition for reinstatement may be filed before the expiration of the five year period, as long as the requested and approved reinstatement date is not before the expiration of the five year period.

5. Also *see* Bar Rule 10(c)(5) (granting the Board the power and duty to review and modify the findings, conclusions, and recommendations of

hearing committees with or without an "appeal").

6. "Clear and convincing" evidence is evidence establishing that something is "highly probable." *Denuptiis v. Unocal Corporation*, 63 P.3d 272, 275 n. 3 (Alaska 2003), *citing Spenard Action Committee v. Lot 3, Block 1, Evergreen Subdivision*, 902 P.2d 766, 774 n. 15 (Alaska 1995).

The Alaska Supreme Court has had only one occasion to consider reinstatement of a disbarred attorney under Bar Rule 29, that being Wiederholt's previous attempt at reinstatement.[7] There, as the Hearing Committee noted in its Finding No. 5, the Court established certain legal principles pertinent to Wiederholt's current petition for reinstatement. Drawn primarily from *In re Pier,* [1997 SD 23,] 561 N.W.2d 297 (S.D.1997), the Court's *"Pier* review" includes the following (taken verbatim from the Hearing Committee's Finding No. 5 [R. 385—386] ):

a. There is a presumption against reinstatement.

b. The Petitioner must show by clear and convincing evidence that he has satisfied the standards for reinstatement.

c. The standards for reinstatement include the following:

1. The Petitioner's present moral fitness.

2. The Petitioner's acceptance of wrong doing with sincerity and honesty.

3. The extent of the Petitioner's rehabilitation.

4. The nature and seriousness of the original misconduct.

5. The Petitioner's conduct following the discipline.

6. The time elapsed since the original discipline.

7. The Petitioner's character, maturity, and experience at the time of the discipline and present.

8. The Petitioner's current competency and qualifications to practice law.

9. Restitution.

10. Proof that the Petitioner's return to the practice of law will not be detrimental to the integrity and standing of the Bar or the administration of justice, or subversive of the public interest.

7. *In Re: Reinstatement of Wiederholt,* 24 P.3d 1219 (Alaska 2001) (*"Wiederholt II* ").

8. This should not be read to suggest, however, that the Board does not consider a hearing committee's evaluation of the evidence or the credibility of witnesses. The Board does, and in this

## STANDARD OF REVIEW

As noted above, it is the *Board's* findings, conclusions, and recommendation that go to the Court with a reinstatement petition. While a hearing committee is delegated the responsibility (1) to conduct a hearing and related proceedings to create a record and (2) to make its own findings, conclusions, and recommendation, the ultimate responsibility for the findings, conclusions, and recommendation to the Court rests with the Board. The Board independently reviews the record created and considered by the hearing committee *and* the subsequent record of proceedings before the Board, and makes its own decisions. Bar Rule 29(c)(2); Bar Rule 10(c)(5) (granting the Board the power and duty to review and modify the findings, conclusions, and recommendations of hearing committees).

Contrary to Wiederholt's urgings in his brief to the Board [R. 448—449], the Board *may* independently weigh the evidence, the Board is *not* limited to reviewing the Hearing Committee's factual findings for "clear error" (under Alaska Civil Rule 52), and the Board is *not* required to view the evidence presented to the Hearing Committee in the light most favorable to Wiederholt.[8]

## FINDINGS OF FACT [9]

1. Wiederholt was disbarred by order of the Alaska Supreme Court on July 8, 1994. *In Re: Disciplinary Matter Involving Wiederholt,* 877 P.2d 765 (Alaska 1994) (*"Wiederholt I* "). Wiederholt currently is eligible to be considered for reinstatement under Bar Rule 29.

2. The Hearing Committee noted the reasons for Wiederholt's disbarment only in passing (at page 33 of the Hearing Committee's report [R. 415] ), but the basis for that disbarment is important to the *Pier* review process and the Board's findings and conclusions.

case did, take these matters into account when arriving at its decision.

9. To the extent that any findings of fact may be construed as conclusions of law or that conclusions of law may be construed as findings of fact, they are deemed to be such.

3. In June of 1993, the Board recommended to the Court that Wiederholt be disciplined in connection with seven separate matters involving an even higher number of actual ethical violations.[10] All of the matters were consolidated for one comprehensive disciplinary proceeding before a hearing committee and then the Board. Starting from the Board's lowest recommended discipline and moving to the Board's highest recommended discipline, the matters can be briefly summarized:

(a) Wiederholt was deposing an adverse party and, when off record, was making statements to the party that bothered the opposing counsel. Opposing counsel placed a hand-held tape recorder on the table to record comments during an off-record period of time. Wiederholt turned off the tape recorder, leaned over to opposing counsel and said "fuck you", and then left the room for the deposition lunch break. The adverse party-witness was an older, religious person who was deeply offended. The Board recommended a reprimand for this behavior, but noted that the conduct was part of a pattern of troubling conduct and an apparent inability to control anger and behavior that made Wiederholt unfit to practice law.

(b) Wiederholt represented a husband in a potential divorce proceeding, and, believing the wife to be un-represented, called her and left a voice mail message. The spouse actually had counsel and informed her counsel of the message. Counsel called Wiederholt, identified herself by name and as counsel for the wife, and engaged in a discussion about the couple's marital assets. Wiederholt became angry and abusive to opposing counsel, who then hung up on Wiederholt. Two days later, Wiederholt sent a lengthy letter directly to the wife; the letter contained settlement terms and suggested that the wife should proceed pro per with a dissolution rather than work with an attorney on a divorce. The Board recommended censure for intentional communication with an opposing party known to be represented by counsel.

(c) Wiederholt was retained to defend a party on a promissory note claim brought by an un-represented creditor. Wiederholt sent a letter to the creditor threatening criminal action (in violation of then DR 7–105A) if the case was not dropped. The Board recommended censure for this misconduct.

(d) Wiederholt went unexpectedly to an opposing counsel's office, and demanded to see opposing counsel (who then was meeting with a client). Opposing counsel interrupted his meeting and came out to the reception area to see Wiederholt, and they got into an argument over an exchange of settlement papers and the settlement check, an argument deliberately set up by Wiederholt; when opposing counsel turned his back and leaned over a counter to review one of the settlement papers, Wiederholt kicked him. The assault was witnessed by one of opposing counsel's clients and by two members of opposing counsel's staff. The Board recommended a 30–day suspension.

(e) In the course of certain federal admiralty litigation, Wiederholt egregiously obstructed discovery in a number of different manners with the specific intent to delay the proceedings, engaged in shouting matches with opposing counsel, and filed papers containing allegations against an opposing counsel solely to harass and embarrass him. The federal judge sanctioned Wiederholt and referred the matter to the Bar. The Board recommended a 30–day suspension for this misconduct.

(f) Wiederholt represented an individual in certain litigation for which he agreed to be compensated only from any court-awarded attorney fees. Wiederholt's client prevailed

---

**10.** The earlier Board's Recommendations are at R. 91—98, but the underpinning of those Recommendations was the area hearing committee's reports to the Board, found at R. 35—90. All of the present Board's Finding No. 3 is based on R. 35—98, as well as the Bar Association's Exhibit of all of the materials from Wiederholt's prior petition for reinstatement, which includes the same materials as found at R. 35—98 as well as an MMPI and the transcript of the area hearing committee's sanction hearing. These materials are in Volume II of the current record and have two simultaneous but different numbering sequences: (1) 56—207 (the previous Board record for Wiederholt's earlier petition), and (2) 692—859, 1708—1710, and 2958—3042 (the previous Alaska Supreme Court record for Wiederholt's earlier petition).

at trial, but the adverse party appealed. Wiederholt then demanded that his client pay him $1,000 to do the appeal. The client agreed on the condition that he get his $1,000 back after Wiederholt received the first $4,000 of the court-awarded fees. Wiederholt's client prevailed on appeal and the adverse party made an initial payment of $7,500 with a check made payable to Wiederholt and his client, jointly. The client came to Wiederholt's office to sign a satisfaction form and asked about the check; Wiederholt became very angry and said that he would pick up the check, that the former fee arrangement was off, and that he was entitled to all of the money. Wiederholt obtained the check, forged the client's signature on the check, and deposited it into his trust account to gain an advantage in the fee dispute. Wiederholt then had a telephone conversation with the client that was surreptitiously taped by the client; during the conversation, Wiederholt was often out of control and enraged, and he attempted to intimidate the client, screaming obscenities at him and threatening to "expose" him by revealing confidential information. The tape recording also demonstrated that Wiederholt had indeed made the fee arrangement stated by the client; Wiederholt submitted contrary false testimony to the hearing committee about the fee arrangement. The Board recommended disbarment for this misconduct.

(g) Wiederholt represented his brother-in-law as a client in an effort to obtain money for him. Nearly ten years before, the client had obtained a $28,000 judgment against a debtor for failure to pay for certain equipment. He then executed on the judgment, causing an execution sale of that same equipment. The client credit-bid the full amount of his judgment to purchase the equipment. A Bill of Sale was executed in the client's favor and the Alaska State Troopers filed a Return of Service On Writ Of Execution. However, no satisfaction of judgment was filed in the court case. The client apparently later discovered that the equipment was worthless. Years later, the client became aware of someone who owed the original debtor some money, but who wanted to pay the money to the original debtor's creditors. He went to Wiederholt, and Wiederholt, knowing the full circumstances of the credit-bid and purchase of the equipment at the judgment execution sale, wrote a demand letter asserting that his brother-in-law client was entitled to full payment of the original $28,000 judgment. In the ensuing interpleader action, Wiederholt filed papers with the court, including an affidavit from his brother-in-law, that were deliberately crafted to lead the court and the other parties to believe that no execution sale and full credit-bid on the original judgment ever had occurred, and Wiederholt deliberately withheld material facts from the court and the other parties that would have clarified the papers he filed. One of the other parties discovered the true facts, and Wiederholt's client executed a satisfaction of the original judgment and withdrew his claim in the interpleader action. A sanctions hearing ensued; Wiederholt's position before the court was that he had advised the client that the judgment was not satisfied because the property purchased at the execution sale was not "satisfactory" to the client due to the equipment's lack of value. However, at the hearing committee, Wiederholt had a completely different theory, claiming that he had a good faith basis to file a claim in the interpleader action because the property executed upon actually had belonged to his client and not to the judgment debtor (because the debtor had never paid the client for the property), and, therefore, the client was entitled to the judgment for the sales price for selling the equipment to the debtor and also to the equipment itself (until such time as the client received $28,000, when the client then would have to convey the equipment to the debtor). The Board recommended disbarment for this misconduct.

4. It is important to note that the hearing committee in the initial discipline proceedings, and the Board by its adoption of almost all of that hearing committee's findings, found on several occasions that Wiederholt was not truthful in his sworn testimony before the hearing committee, was not truthful to the Bar when confronted with various allegations of misconduct, and was "basically a dishonest person" [R. 37—38 (¶ 11); 40—41

(¶ 19); 53—54 (¶ 53); 55 (¶ 57); 58—59 (¶ 65); 63 (¶ 81); 79—80 (¶ 9); 81 (¶ 11); 84 (¶ 4); 88—89 (all) ]. It is further important to note that Wiederholt himself presented expert medical testimony at the sanctions portion of his hearing that he suffered from "a long standing paranoid personality disorder" and that treatment was recommended for one to one and a half years [R. 72—73]. It is further important to note that interwoven throughout the hearing committee's/Board's sanction report are articulate discussions of the symptoms explained by the personality disorder, such as anger, intimidation, self-righteous indignation, and feelings of being wronged by others, as well as conduct *not* explained by the personality disorder, such as simple dishonesty [R. 71—90]. Lastly, it is important to note that the expert medical testimony was not optimistic about Wiederholt's chances of positive change [R. 72—73; 78—79 (¶ 8) ]; those with Wiederholt's personality disorder are "not likely to change significantly and may terminate therapy prematurely."

5. Wiederholt's November 10, 1992, MMPI (Bar Association Exhibit, pp. 120 (1706)—122 (1710)) is telling in its consistency with Wiederholt's own expert medical testimony and the Board's findings about Wiederholt's behavior. It reflects that an individual with Wiederholt's profile (a) is overly sensitive to criticism and tends to react to even minor problems with anger and hostility; (b) tends to project and externalize blame; (c) does not assume responsibility for his problems, but rather blames others or rationalizes his own faults; (d) is not likely to change significantly; and (e) tends not to seek psychological help, or only to submit to it at the request or insistence of others.

6. In *Wiederholt I,* the Court accepted the Board's recommendation of disbarment based on the two matters for which disbarment was recommended, buttressed by the "kicking" incident and the misconduct in the federal admiralty litigation. The Court found no need to deal with the other matters in light of its acceptance of disbarment for the matters noted. *Id.,* 877 P.2d at 768—769. In addressing Wiederholt's arguments against disbarment, the Court specifically noted (1) that Wiederholt's defense to the "execution sale" matter was legally wrong, and (2) that the Board's conclusion that Wiederholt was guilty of forgery in connection with the "forged check" matter was correct. *Id.* at 768.

7. On June 22, 1999, about two and a half weeks before the five-year anniversary of his disbarment, Wiederholt petitioned for reinstatement. With his verified petition paperwork, Wiederholt testified as follows by Affidavit:

14. I regret and deeply appreciate of [sic] the nature, scope, and consequence of the misconduct precipitating the discipline which this petition would conclude. I have attempted to maintain a good and moral lifestyle and character of the type and quality to which the Bar and the Court ascribe allegiance. I have accepted the discipline imposed and while I regret its imposition, it has come to pass that I regard the same as responsible for making me a stronger and better person. I believe I have in all material aspects of my life accepted personal responsibility for errors in judgment resulting in disbarment. I hold no animosity toward the Bar, the Court or my accusers. I desire and respectfully ask only to renew a life and practice in a manner and by means of which the Bar and the Court would fully approve.

Bar Association Exhibit, p. 23.

8. A hearing committee heard the evidence for Wiederholt's reinstatement petition on September 10, 1999, and heard arguments on October 8, 1999. The hearing committee recommended against reinstatement on February 3, 2000 [R. 162—179].[11] The Board adopted the hearing committee's findings, conclusions and recommendation in total on March 10, 2000 [R. 181 and p. 463 of the Bar Association's Exhibit, Volume II for the rec-

---

11. The evidence received for the reinstatement petition is in the Bar Association's Exhibit, Volume II of the present record. The findings, conclusions, and recommendation also can be found there, marked as pages 375—392.

ord for this petition]. It is helpful to the Board's consideration of Wiederholt's current petition to set out relevant portions of those findings, conclusions, and recommendations:

## FINDINGS OF FACT

. . .

12. During the period of his disbarment, Petitioner did not, despite recommendation, undergo any professional treatment or counseling by a mental health professional. Petitioner did seek the advice of and have discussions with his pastor over the past few years, which he attempted to characterize as counseling sessions. The frequency of these visits were the same both before and after his disbarment and occurred seven or eight times a year, nearly two-thirds of which were done while the Petitioner and his pastor were engaged in long bike rides or cross-country skiing.

13. Despite the lack of formal counseling, both Dr. Aron Wolf and Dr. Gene Gustafson agree that Petitioner has matured and grown on a personal level during the period of his disbarment and is mentally fit at the present time.

14. According to Dr. Wolf and Dr. Gustafson, the Petitioner is not presently in need of counseling, and psychological tests indicate his level of being able to deal with stress and pressure is significantly higher now than prior to disbarment.

15. Petitioner has not been subjected to the same type and extent of pressures present in the unsupervised practice of law and has benefited significantly from the cocoon effect created by the work environment in which he has placed himself as a paralegal/research analyst, as well as the supervision and oversight of the attorneys for whom he has been working.

16. In Dr. Wolf's opinion, it would be significantly healthier for Petitioner to continue to work in a collegial environment and not alone. Petitioner was unclear as to his future employment plans should he be reinstated. He did not, however, rule out again entering solo practice.

17. While Petitioner shows some insight in to the reasons for his disbarment, for example, recognizing his former style of practice was too "caustic" and that he was a "hard ass" with control problems, throughout his testimony Petitioner either continued to deny, minimize, rationalize his misconduct or attempted to justify his misbehavior.

18. Petitioner still believes that he did not act unethically. Rather, his discipline problems were one of definition in that he defined "unethical conduct" differently than the Bar and the Supreme Court.

19. Rather than accept responsibility for his actions, throughout the hearing Petitioner minimized his behavior as nothing more than "overzealous" representation that was justified because he was acting "in the best interest of his clients."

20. Both through testimony and argument presented, Petitioner made clear that he believed his disbarment was more for appearances or guilt by implication than for "heinous acts" and that the punishment he received was unjustified and too harsh. Moreover, through both testimony and argument Petitioner exhibited many of the same traits that were part and parcel of the behavior leading to his disbarment, including but not limited to, blaming others for his predicament, accusing Bar counsel of soliciting grievances against him, and accusing Bar counsel of being a liar.

. . .

23. While Petitioner was candid in his admission that he could not promise he would never cause harm again, there were other parts of his testimony that, based on his demeanor, demonstrated a lack of candor and insight into the significance of his misconduct. When Petitioner's testimony may be contrary to any of these findings, it was deemed for these reasons not to be credible.

## CONCLUSIONS OF LAW

. . .

**Personal Qualifications:**

. . .

12. **Moral Fitness:** Petitioner has failed to meet his burden of establishing by clear and convincing evidence that he currently possesses the requisite moral qualifications to practice law in this state and at this time for the following reasons:

. . .

(b) The Petitioner's character witnesses offered little in terms of substantive evidence concerning Petitioner's moral fitness or ethics as a lawyer or, in the case of Leona Cage, did not provide credible testimony. What testimony that was provided consisted of nothing more than broad general statements that the witness knew of no reason to suggest Petitioner was morally unfit to resume practice. This testimony, however, is entitled to little weight due to the fact that none of these witnesses appeared to know much, if anything, about Petitioner's pre-disbarment practice or the extent or severity of his misconduct.

(c) There is no direct evidence in the record, other than relating to the acts for which Petitioner was disbarred, reflecting negatively on Petitioner's current moral fitness. However, disbarment conclusively proves lack of moral fitness to practice law at the time of disbarment and, while not determinative in reinstatement, it continues to be evidence of lack of moral fitness at later times. *See, e.g., In re Pool,* [401 Mass. 460,] 517 N.E.2d [444] at 447 [(1988)]. In other words, it is Petitioner's burden to establish by clear and convincing evidence that he is morally fit in spite of the previous misconduct. *In re Montgomery,* 566 N.W.2d 426, 230[430] (N.D.1997). In analyzing Petitioner's moral fitness, the seriousness of the misconduct can outweigh an otherwise sufficient showing. This is exactly the case here.

(d) Given the severity of Petitioner's multiple acts of misconduct, his apparent lack of appropriate remorse or regret,[2] his attempt to deny, minimize, and rationalize his misconduct and justify his misbehavior [3] in conjunction with his display during the hearing of many of the same traits that were part and parcel of the behavior leading to his disbarment, and lack of his testimony, what evidence Petitioner did present as to his current moral fitness simply does not rise to the level of clear and convincing.

---

[2] While Petitioner expressed regret at his disbarment, it was not regret for his conduct or remorse for his behavior but rather that he "deeply regret[ed] the findings that the court came to."

[3] We do not mean to imply by this statement that we believe that it is a condition of reinstatement that Petitioner confess to unethical conduct he does not believe he committed. Rather, we agree with the analysis of the Supreme Court of Pennsylvania that his failure to acknowledge wrongdoing in the face of overwhelming evidence to the contrary is evidence that Petitioner currently has no "greater understanding of this responsibilities as an attorney for 'trust, candor and honesty' than he did at the time of disbarment." *In re Costigan,* [541 Pa. 459,] 664 A.2d 518, 523 (Pa. 1995)

---

(e) As discussed below, Petitioner has also failed to present clear and convincing evidence that he will not repeat his misconduct in the future. Unless an applicant for reinstatement can prove that his conduct will not be repeated, he can not establish good moral character in the present. [*Matter of Application of*] *Nash,* [317 Or. 354,] 855 P.2d [1112] at 116–17[1116–117 (1993)].

(f) The Panel wishes to make clear that it does not consider Petitioner to be a man who is somehow amoral or unvirtuous in his personal beliefs and practices. In fact, the Panel applauds the efforts towards rehabilitation Petitioner has made to date. At this time, on the evidence presented, his past and present actions still speak louder than his present words.

### Professional Integrity and Public Protection

13. The Panel also concludes that Petitioner has failed to prove by clear and convincing evidence that his resumption of

the practice of law at this time would not be detrimental to the integrity and standing of the Bar or the administration of justice or subversive of the public interest for the following reasons:

14. [ ] Here, Petitioner sought reinstatement at the earliest possible moment of eligibility. Indeed, his Petition for Reinstatement was actually filed several weeks before the mandatory term of his disbarment expired. Given the sheer magnitude of Petitioner's misconduct leading to his disbarment, particularly in the face of the findings of the disciplinary hearing relating to Petitioner's candor and dishonesty, to reinstate the Petitioner at the earliest possible opportunity would not only be detrimental to the standing and integrity of the Bar but subversive of the public interest as well. In other words, even if we believed Petitioner had met his burden of proof in this case, Petitioner's transgressions demand imposition of a period of disbarment longer than five years.

15. The maintenance of the highest standards of professionalism and integrity are the best safeguards to the public, the justice system and the Bar. A lawyer who has breached those standards badly enough to be disbarred must exceed them before the privilege of Bar membership is again conferred upon him. A disbarred applicant can not just show that he had unblemished conduct during the minimum mandatory disbarment period, or submit some evidence of recovery from personal problems and expect to be given the benefit of all doubts. *See, e.g., In re Menna*, [11 Cal.4th 975, 47 Cal.Rptr.2d 2, 10,] 905 P.2d [944] at 952 [(1995)]. He simply is not entitled to that. *Id.* Instead, the Petitioner must show "overwhelming proof of reform" coupled with "exemplary" conduct before he is entitled to reinstatement. *Id.; In re Guttman[Gutman]*, 599 N.E.2d [604,] at 607 [(Ind.1992)]. Petitioner has come nowhere close to meeting that burden here.

16. [ ] While Petitioner did provide clear and convincing evidence that he is more mature and mentally stable today than a few years ago, such a showing is not enough under the facts of this case. Petitioner failed to show by clear and convincing evidence that it is unlikely that he will not again harm others. Indeed, the two most serious ethical breaches of which Petitioner was convicted were not acts that can be said to have arisen from inexperience, youthful ignorance, anger or loss of self control. Rather, they were "knowing [ ] and intentional" acts of misconduct done "with the conscious purpose of achieving ... wrongful objectives." *In re Wiederholt*, 877 P.2d at 774. Thus, while Petitioner has convincingly shown that he is unlikely to "be a hard ass, anymore," Petitioner was not disbarred for "being a hard ass." Under these circumstances, there are serious questions concerning whether Petitioner could again cause harm and thus it would not be in the public interest to allow Petitioner reinstatement at this time.

17. Petitioner's current attitude towards his misconduct and subsequent discipline has remained remarkably consistent over the years which weighs heavily against his claim of rehabilitation and demonstrates that he currently has no greater understanding of his responsibilities and obligations as an attorney than he did at the time of his disbarment. For example:

   (a) In 1993, the disciplinary committee found that Petitioner "is not a beginner in the practice of law having been admitted in 1983, and his misconduct does not arise out of inexperience." *In re Wiederholt*, 877 P.2d at 776. In his testimony, Petitioner portrayed his misconduct as primarily a combination of youthful indiscretion and inexperience.

   (b) In 1993, the disciplinary committee found that Petitioner showed "no remorse and accepts no responsibility for his actions" and refused to "acknowledge any wrong doing" *Id.* at 775 & 776. While Petitioner today shows some insight into the inappropriateness of his prior behavior, he continues to either deny, minimize, rationalize or justify his behavior and insists that he did not act unethically. Petitioner has never offered an apology to those harmed by the misconduct leading to his disbarment. The only regret or remorse

Petitioner expressed concerning his disbarment was that he "deeply regret[ed] the findings that the court came to." The "profound effect" on Petitioner caused by his disbarment, according to his own testimony, is that "it has taken me from where I thought I was pretty high up on the food chain, and put me back down to where— the week after I was disbarred, I went to work as a laborer in construction for my family's construction company."

(c) In 1993 the disciplinary committee found that Petitioner "has engaged in game playing and semantics when dealing with opposing parties, Bar Counsel and this Committee." *Id.* at 775. During his testimony Petitioner testified that he does not believe he acted unethically but rather the problem was one of definition in that he defined "unethical conduct" differently than the Bar and the Supreme Court. Moreover, Petitioner during cross examination continually quibbled over semantics of the term "forgery" in the face unmistakably clear language from the Supreme Court to the contrary. *See Id.* at 768 & 774.

18. Both through testimony and argument presented, Petitioner made clear that he believed his disbarment was more for appearances or guilt by implication than for "heinous acts" and that the punishment he received was unjustified and too harsh. Petitioner's lack of insight into the seriousness of his misconduct is indeed "underwhelming evidence" that his reinstatement is justified and will not again harm the interests set forth in Rule 29(c)(1). [ ]

19. Throughout the reinstatement hearing. Petitioner continued to exhibit characteristics of the same type of abusive litigation practice tactics and lack of respect for the system that contributed to his disbarment demonstrating he still does not have the proper professional understanding of the purpose and role of litigation. For example, during his testimony Petitioner accused Bar counsel of soliciting grievances against him and contributing to his divorce and, through counsel, belittled another disbarred lawyer and accused Bar

counsel of lying about an indisputably established fact. Moreover, against all strategic logic, Petitioner went to considerable efforts to keep this Panel in the dark concerning his disciplinary record.

20. Petitioner has presented insufficient justification, let alone clear and convincing evidence, to overcome the presumption against reinstatement after disbarment.

21. While Petitioner undoubtedly has made significant emotional improvement since his disbarment, both Dr. Gustafson and Dr. Wolf linked this progress in large part to his mentoring and the lower stress of paralegal work. Petitioner has made no showing as to his ability to remain stable once subjected to the stresses of again practicing law. Though an applicant shows emotional improvement, there must be clear and convincing evidence that he can remain stable when he is once again put in direct responsibility for a client's affairs, with the "inherent stresses" inevitably caused by that situation. *In re Nash*, 855 P.2d at 1116. Petitioner has failed to carry that burden here.

. . .

23. While Petitioner was "vouched for" by several long standing members of the Bar, and a former Supreme Court Justice, even impressive character testimonials, by themselves, are not enough to establish a disbarred lawyer's rehabilitation. *In re Menna*, [47 Cal.Rptr.2d at 9,] 905 P.2d at 951. Indeed, of more significance to this matter is the fact that all of Petitioner's witnesses knew little or nothing about how he used to practice law or why he was disbarred, which suggests Petitioner lacks insight into the significance to others of his misconduct.

## RECOMMENDATION

It is the conclusion of this Panel that Petitioner has failed to prove by clear and convincing evidence that he currently possesses the moral qualifications to qualify for reinstatement or that his resumption of the practice of law would not be detrimental to the integrity and standing of the Bar or the administration of justice or subversion of the public interest. We therefore

recommend that Petitioner's Request for Reinstatement be denied.

9. The Alaska Supreme Court affirmed the Board's recommendation to not reinstate Wiederholt on June 15, 2001, *Wiederholt II*, 24 P.3d 1219. A good number of issues discussed in that opinion are relevant to Wiederholt's current petition.

10. For obvious reasons, Wiederholt argued to the Court that it was error for the Board to have considered (1) Wiederholt's conduct leading to disbarment, (2) Wiederholt's lack of remorse, and (3) the amount of time passed since Wiederholt's disbarment. *Wiederholt II*, 24 P.3d at 1226. The Court disagreed, and the Court's comments are apt:

*a. Consideration of a petitioner's past conduct is appropriate.*

. . .

It makes little sense to consider a disbarred attorney's petition for reinstatement entirely in a vacuum, ignoring the conduct and attitude that led to disbarment. Rather, the bar association's argument that "[d]isbarment conclusively proves lack of moral fitness" at the time of disbarment and "remains as evidence of lack of moral fitness later" is supported by the decisions of courts in other jurisdictions that have explicitly acknowledged that the conduct that led to the petitioner's disbarment is an important factor to consider when determining whether the petitioner should be reinstated.

. . .

We agree with the intermediate approach taken by the majority of courts, and we conclude that a petitioner's past conduct plays an important role in determining whether the petitioner has been rehabilitated. We therefore hold that it is appropriate to consider a petitioner's past conduct in a reinstatement proceeding.

*b. Consideration of a petitioner's acknowledgment of and/or level of remorse for prior actions is appropriate.*

. . .

As discussed above, a primary concern of the reinstatement process is whether the petitioner has been rehabilitated and whether he has presented sufficient evidence to demonstrate that those weaknesses that produced the earlier misconduct have been corrected. Because the petitioner's remorse and acknowledgment of prior wrongdoing are vital to this determination, we hold that this factor is appropriate to consider in a reinstatement decision.

*c. The board may take into account the amount of time that has passed since disbarment.*

In making its determination in Wiederholt's case, the board explicitly took into account the relatively short amount of time that had passed since his disbarment. It noted that Wiederholt had petitioned for reinstatement "at the earliest possible moment of eligibility" and had filed his petition for reinstatement "several weeks before the mandatory term of his disbarment expired." It was not error to consider this factor.

Other jurisdictions have considered the length of time an attorney has been disbarred in conjunction with his or her past acts when determining whether reinstatement should occur. The Rhode Island Supreme Court has stated that "[w]hen an attorney has engaged in repeated acts or a calculated series of acts designed to corrupt the administration of justice, the showing of present fitness may require a lengthier period of rehabilitation." We agree with that assessment and conclude that this factor is applicable in this case and was properly considered.

*Wiederholt II*, 24 P.3d at 1226—1228 (footnotes omitted).

11. The Court then dealt with the substance of these and other issues:

*1. Wiederholt's testimony and evidence did not prove that he has the requisite moral character for reinstatement.*

. . .

*a. Wiederholt's past conduct*

. . .

The record does support the bar association's argument—Wiederholt's misconduct was indeed serious. As this court's opinion and the attached appendices in his disbarment case indicate, Wiederholt en-

gaged in numerous and repeated instances of misconduct over a span of four years, including committing criminal forgery, assaulting opposing counsel, engaging in abusive discovery tactics, using threatening language towards opposing counsel, and writing a threatening letter to an unrepresented claimant on behalf of a client. All of these, taken together, demonstrate a pattern of serious misconduct and therefore provide some evidence that Wiederholt lacks the requisite moral fitness to be readmitted to the practice of law in Alaska.

*b. Wiederholt's lack of remorse*

. . .

An examination of the full record supports the bar association's contentions. The transcript of Wiederholt's testimony is replete with examples demonstrating that he has little remorse for his previous actions and has no consciousness or understanding of the nature or extent of his past wrongdoing.

. . .

The board found the fact that Wiederholt did not apologize to several of his victims to be a significant indicator of his lack of remorse for his previous actions, and consequently, a lack of understanding of his prior wrongdoing. The record supports this conclusion: Wiederholt did not apologize or make any restitution to at least three of his former victims.

Also significant to the board was Wiederholt's insulting and abusive attitude towards others. This trait was manifested by Wiederholt, and through counsel, in belittling a disbarred lawyer who allegedly works as a hotel doorman, and criticizing a judge and bar counsel for mistreating him.

*c. Wiederholt's failure to take remedial measures previously recommended by the board and this court*

. . .

The fact that Wiederholt did not take the board's recommendation and seek professional counseling is strong evidence of his disregard of the import of the Disciplinary Board's suggestions, as well as his failure to recognize the nature and extent of his wrongdoing.

*d. Wiederholt's witnesses*

Wiederholt argues that the board erroneously disregarded the testimony of his witnesses, all of whom testified favorably and put their professional reputations behind him. The bar association concedes that much of the testimony of Wiederholt's witnesses is favorable; however, it states that this evidence was not strong enough to overcome the presumption against reinstatement.

The board concluded that the weight of the witnesses' testimony was insufficient to satisfy Wiederholt's high burden of proof for a number of reasons. Although his witnesses testified favorably about him in other areas, they did not have sufficient information about his moral qualifications. For example, while Wiederholt's employers were able to address his legal competency and his pastor testified to his ability to handle daily problems, they had virtually no knowledge of how he conducted himself in the practice of law or the events that led to his disbarment. Similarly, the testimony of his friends, though conveying favorable character judgments, did not reveal knowledge of the events leading to his disbarment. Consequently, the board concluded that Wiederholt's witnesses could not adequately evaluate whether Wiederholt truly had reformed.

For these reasons the board did not err by discounting the testimony of Wiederholt's witnesses on the subject of moral fitness. . . .

. . .

While the psychiatrists testifying at the hearing both stated that Wiederholt has made significant strides in his emotional development, the board found that this improvement did not necessarily indicate that Wiederholt was morally fit to practice law or that he could handle the stresses of being a lawyer if permitted to resume that position. While we recognize that Wiederholt has made some improvement emotionally, we agree with the board's conclusion regarding the impact of the stresses of the practice of law.

First, because the doctors had evaluated Wiederholt in his present work situation, where he is supervised by other lawyers and shielded from the pressures of law practice, their testimony provided no indication that Wiederholt could withstand the pressures of being a lawyer, especially a solo practitioner. Second, at the time of disbarment, psychiatrist Dr. Aaron Wolf testified that Wiederholt's dishonest acts could not be completely explained by psychological insights, and the Hearing Committee concluded that Wiederholt's actions "seem[ed] unrelated to his personality disorder." Therefore, an improvement in Wiederholt's psychiatric situation, without more, does not indicate that the circumstances that led to his disbarment would not happen again. Finally, Wiederholt did not seek counseling from a mental health professional and instead opted to continue to receive informal emotional counseling from his pastor. As discussed above, given the nature of these counseling sessions, the board did not err in concluding that they had little effect in reforming Wiederholt's moral character.

. . .

#### e. Conclusion

The record supports the board's conclusion that Wiederholt has not proven his moral fitness by clear and convincing evidence. Wiederholt's testimony, in which he blames this court and the Alaska Bar Association for his problems and attempts to justify and minimize his actions, shows that he fails to understand the extent and significance of his previous misconduct. His refusal to seek psychiatric assistance as suggested by the board in the 1993 proceeding demonstrates his reluctance to comply with the demands of the Disciplinary Board. Finally, the testimony of his witnesses, though favorable in some. respects, is insufficient to satisfy his burden of proving by clear and convincing evidence that he is morally fit to practice law.

*2. Wiederholt did not prove by clear and convincing evidence that his reinstatement will not be detrimental to the integrity and standing of the bar, the administration of justice, or subversive to the public interest.*

The board also concluded that Wiederholt did not meet his burden of proving by clear and convincing evidence that his reinstatement will not be detrimental to the integrity and standing of the bar or the administration of justice, or subversive to the public interest.

As discussed, the board correctly found that Wiederholt did not meet his burden of proving by clear and convincing evidence that he is morally fit to practice law. Many of those same issues and concerns are pertinent to the issue of the integrity of the profession and public protection. And the board's conclusions are again amply supported by the record.

First, the board found that serious questions existed concerning Wiederholt's possibility of causing harm in the future despite his showing that he "is more mature and mentally stable today than a few years ago." The board noted that Wiederholt's most serious instances of misconduct did not arise from inexperience, ignorance, or psychiatric problems and were instead "knowing and intentional acts of misconduct" performed with "the conscious purpose of achieving wrongful objectives."

Second, the board found that Wiederholt's lack of remorse, lack of consciousness concerning his past wrongdoing, failure to accept responsibility for his actions, and his tendency to justify and minimize his past behavior provide strong evidence that he could again engage in similar behavior in the future.

Third, the presentation of Wiederholt's case at the hearing, which included belittling another disbarred lawyer, and accusing bar counsel of soliciting grievances against him, also indicated that Wiederholt had not abandoned the lack of respect for the system and abusive litigation tactics that had led in part to his disbarment.

Fourth, the board further found that Wiederholt has made no showing that he will be able to function unsupervised in the stress-filled practice of law since the testimony of the psychiatrists at the hearing

was based on observations of him in the highly supervised, lower stress employment he had as a paralegal.

Finally, the board found that Wiederholt's witnesses' lack of knowledge about the events that led to his disbarment suggested that his witnesses could not provide informed insight into whether Wiederholt truly had reformed.

Again, Wiederholt's argument that the board did not present any evidence or witnesses to back up its position is inapposite; the burden of proving that his reinstatement will not be detrimental falls on Wiederholt, not the board.

Because the record supports the board's conclusion that Wiederholt did not prove by clear and convincing evidence that his reinstatement will not be detrimental to the integrity of the bar or the public at large, we uphold its decision on this issue.

*Wiederholt II*, 24 P.3d [at] 1228–32 (footnotes omitted).

12. A mere eight months after the issuance of *Wiederholt II*, Wiederholt again petitioned for reinstatement [R. 1—26]. Wiederholt's affidavit in support of this petition was unmistakably designed to meet the Board's and the Court's conclusions in *Wiederholt II* [R. 13—18]:

10. Additionally, I have been seeing Dr. Aaron Wolfe as part of my plan to assure adequate counseling in aid of my desire to return to the practice of law unencumbered by any problems that may have affected my prior practice.

11. In advance of my earlier petition for reinstatement, I secured the services and psychological/counseling of Dr. Gene Gustafson so as to assure myself and others of my personal and psychological preparedness for the return to the practice of law. Dr. Gustafson's report and testimony before the prior committee I believe confirm that I am as free as anyone can be, of being overwhelmed by those stresses associated with the practice of law. (Tr. at p. 255)

12. In advance of my earlier petition for reinstatement, I also participated in an independent evaluative psychological examination proposed by the Bar Association and conducted by Dr. Aaron Wolfe. Dr. Wolfe's report and testimony during the previous hearing provided expert opinion that I was then, as I believe myself today, mentally fit to be entrusted with the duties of an attorney. [Tr. page 226]

13. I incorporate the evaluative reports and hearing testimony of Drs. Gustafson and Wolfe herein and by reference as the same confirms, on a clinical basis, my fitness for practice. Dr. Aaron Wolfe's most recent report is attached as well. It too provides sufficient proof of my character and mental preparedness for the practice of law.

14. [ ] While ruinous pride, arrogance and foolish self-deception and self-importance had caused me to harbor reservations respecting the discipline afforded me in the initial disbarment, I have, over the course of these long seven years, come full circle. I stand humbly before the Court and Bar Association fully aware of and painfully repentant for the shame and disgrace I cast upon the profession, the Bar, the Court and myself. I caused others harm which I hope, through the loss of my practice and my personal apologies to them, has been in some sense mitigated.

15. Fully, and without reservation, I accept the findings of unethical behavior found within the original disbarment proceeding. The findings were, at the time of disbarment, accurate and unassailable portraits of a person unworthy to practice. The punishment imposed was great, yet fairly deserved. I have, with aid, advice and counsel of my close friends, employers, Pastor, and professional analyst realized the folly of my self-indulgent arrogant behavior. I have fully abandoned any former pretense that my misconduct was anything less than deserving of the findings made and punishment imposed. I am, I believe, a better man for the experience and will be better able to represent my clients and the profession according to the high standards of the Bar and the Court.

. . .

22. I have no words to express my regret for my errors in judgment. I offer my profound remorse and shame for the conduct precipitating these proceedings. I and the witnesses who will testify on my behalf, hope to lay to rest any lingering reservations respecting my character or skills as a lawyer. I have, over the course of more than seven years since disbarment, attempted to maintain a good and moral lifestyle and character of the type and quality to which the Bar and the Court fairly demand. I have accepted the discipline imposed because I committed grave errors in ethical judgment that made serious punishment, through disbarment, both inevitable and appropriate. I stand before the court ashamed that such difficult sanction was necessary. Nevertheless, its imposition has given me cause to reassess my life and redouble my effort to live precisely by the letter and spirit of the high standards the Court must impose upon all who practice before it. It has come to pass that the very same punishment is responsible for making me the stronger person I submit to the Court's consideration today. I believe I have in all material aspects of my life accepted personal responsibility for serious errors in judgment resulting from greed, pride, arrogance and indifference; ending in disbarment. I hold no animosity toward the Bar, the Court or my accusers. They each were correct in their assessment of my former character. I desire to amend the Court's concerns and respectfully ask with humble respect to renew my life and practice in a manner and by means of which the Bar and the Court would be proud.

13. Wiederholt's petition triggered the current reinstatement proceedings. The petition was referred to the Hearing Committee, and as noted earlier, the Hearing Committee conducted its hearing and issued its findings, conclusions and recommendation that Wiederholt be reinstated to the practice of law [R. 383—419].

14. As framed by the arguments and comments to the Board, however, the ultimate resolution of the petition depends on the proper view of relative theories of time. Wiederholt argues that notwithstanding the disbarment and the failed prior petition, the long and slow march of time ultimately, if belatedly and only recently, led him to his clear realization of his previous inappropriate behavior, to his sincere remorse, to the "cure" of his personality disorder, and to a stage in his life where he can practice law within the bounds of the rules and be a positive influence with clients and the Bar. According to Wiederholt, this moment in time arrived soon enough to be demonstrated at the hearing, and all that matters is the moment in time as of the hearing. Bar Counsel looks at time and argues that there has been an insufficient amount of it since the failed petition, and queries what happened, what event or epiphany transpired since *Wiederholt II*, that would support a conclusion that Wiederholt really has changed and that he should be readmitted to the practice of law. The Hearing Committee evidently was persuaded by Wiederholt.

15. The Board agrees that time is the determinative factor in this case. With all of the foregoing in mind, the entire sequence of events must be examined within the context of a time-line, including how that time-line impacts the *Pier* review factors.

16. Wiederholt was disbarred in 1994 for very serious misconduct. Wiederholt lied to Bar Counsel about the grievances filed against him; Wiederholt lied, under oath, to the area hearing committee hearing those grievances. At no time during the disbarment proceedings did Wiederholt express remorse for any of his actions. Consistent with the personality disorder ascribed to him, Wiederholt blamed everyone but himself for his troubles, including the Bar and Bar Counsel. The simple but unfortunate truth of the matter is that Wiederholt was a menace to the practice of law in Alaska and was properly disbarred.

17. Consistent with the personality disorder ascribed to him, Wiederholt simply could not wait for the opportunity to petition for reinstatement and show up those responsible for his disbarment. His first petition was filed two and a half weeks before the minimum five-year period of disbarment expired.

Wiederholt's affidavit testimony submitted with his petition was demonstrated, during the reinstatement petition process, to be hollow, if not false at least with respect to his feelings about the Bar and Bar Counsel. *See e.g.* Wiederholt's Affidavit, ¶14, quoted at Finding No. 7, p. 16 above.

18. The most telling aspect of the first petition process was the hearing committee's findings and conclusions in late 1997 (adopted by the Board in March of 2000) about Wiederholt's lack of appreciation for his prior misconduct, his lack of candor to the committee, and his continued attacks on Bar Counsel and the Alaska Supreme Court decision in *Wiederholt I.* (*See* Finding No. 8, at pp. 17–26, above.) In short, even though more than five years had passed since his disbarment: Wiederholt did not believe he had committed offenses worthy of disbarment; Wiederholt blamed others for his troubles; Wiederholt accused Bar Counsel of soliciting grievances against him; Wiederholt falsely accused Bar Counsel of lying to the hearing committee; Wiederholt continued to argue, notwithstanding the Alaska Supreme Court's pronouncement to the contrary, that he did not commit forgery by signing his client's name to a two-party check without the client's consent and negotiating that instrument by depositing the funds in his trust account; Wiederholt continued to argue, notwithstanding the Alaska Supreme Court's pronouncement to the contrary, that he had a legitimate legal basis for presenting his brother-in-law client's positions in the "satisfaction of judgment" case; and Wiederholt showed no remorse for any of his actions, only remorse for having been disbarred. Consistent with the personality disorder ascribed to him, during the five-plus years of disbarment, Wiederholt had not undertaken any of the formal counseling recommended by his medical expert during the disbarment proceedings. Consistent with the personality disorder ascribed to him, and consistent with his position during the reinstatement proceedings that he really had done nothing wrong and his problems were the fault of others, Wiederholt had not apologized to any of his victims during the five-plus years of disbarment.

19. On March 10, 2000, nearly six years after Wiederholt's disbarment, the Board adopted the area hearing committee findings, conclusions and recommendation that Wiederholt not be readmitted to practice law in Alaska. The Board concluded, as had the area hearing committee, that Wiederholt had not shown by clear and convincing evidence (1) that Wiederholt was morally fit to practice law, or (2) that Wiederholt's resumption of the practice of law would not be detrimental to the integrity and standing of the Bar or the administration of justice or subversive of the public interest. (*See* Finding No. 8, at pp. 17–26, above.) It is clear that the nearly six-year passage of time from disbarment to the Board's recommendation had not been sufficient for Wiederholt to have a change of heart and mind.

20. The Alaska Supreme Court did not issue *Wiederholt II* until June of 2001, some fifteen months after the Board's recommendation. There is no evidence of any kind that Wiederholt did anything of relevance during this interim period of time other than "continuing to mature" with life experiences. The Board does not believe that as of *Wiederholt II,* on June 15, 2001, there had been any material change in Wiederholt's appreciation of his past misconduct, in his lack of remorse, or with respect to his personality disorder. There is no reason whatsoever to believe that as of June 15, 2001, nearly seven full years after Wiederholt's disbarment, Wiederholt would have been able to meet the standards for reinstatement. Again, the passage of time was not properly utilized by Wiederholt.

21. As noted earlier, in *Wiederholt II,* the Alaska Supreme Court agreed with the Board's recommendation that Wiederholt not be reinstated to the practice of law in Alaska. All of the Court's significant discussions are quoted herein, *see* Finding Nos. 9—11, at pp. 26–34, above, but it is worth reiterating that the Court, as the Board and hearing committee before it, found it important that Wiederholt had not undergone the recommended formal counseling, that Wiederholt had not apologized to his victims or otherwise shown much in the way of remorse, and that Wiederholt's character witness testimony was de-

ficient because the witnesses did not present apt comparison's of Wiederholt's pre- and post-disbarment conduct or even any real knowledge of Wiederholt's pre-disbarment conduct.

22. However, the very next month, in July of 2001, Wiederholt initiated formal counseling sessions with his medical expert, Dr. Wolf. Consistent with the personality disorder ascribed to him (*see* Finding No. 5, at p. 15, above), he went to Dr. Wolf only because he felt the Alaska Supreme Court and the Board had told him it was a prerequisite to reinstatement. At about the same time, and for the same reason, Wiederholt began making efforts to apologize to his victims. Wiederholt then filed the current petition on February 27, 2002, only seven months after starting his formal counseling sessions and his apologies, and only eight months after *Wiederholt II.* This was a very, very short period of time.

23. In order to believe that on February 27, 2002, Wiederholt met the standards for reinstatement, the Board would have to conclude either (1) that Wiederholt really was a changed person at the time of the first petition process but he simply could not demonstrate it to the hearing committee, the Board, and the Court, or (2) that he had some kind of miraculous change during the short period of time between July of 2001 and February 27, 2002, that would warrant readmission to the practice of law. The Board concludes that neither is true.[11]

24. For the most part, Wiederholt's witnesses at the hearing before the Hearing Committee were the same witnesses from his first hearing. The only significant additions were family members, whose testimony is suspect for bias, and, somewhat more disconcertingly, Wiederholt's counsel from the first petition process (along with Wiederholt's counsel from the original disbarment proceedings, who also was a witness at the first petition hearing). These two witnesses had a difficult time honoring the line between being fact/opinion witnesses and being advocates from the witness chair,[12] and there was some tension between counsel's performance during the first petition process and performance as a witness.[13] The witness testimony really was not that different in substance from the testimony at the first petition hearing, except that the witnesses obviously had been prepared to testify that now they knew about the reasons for Wiederholt's disbarment and that it did not change their opinions that Wiederholt was ready for reinstatement. The new-found knowledge, of course, came from Wiederholt solely for the purpose of meeting the Alaska Supreme Court's comments in *Wiederholt II.* The only real new testimony at the second hearing was the testimony about the recent apologies and the one-year-plus formal counseling sessions. The medical expert testimony was essentially the same as before, that Wiederholt was ready to resume the practice of law in an appropriate setting. The testimony presented by Wiederholt is not sufficient to meet his

11. As set forth in a concurring recommendation, Board members Robert Johnson and Lawrence Ostrovsky are of the opinion that the Board need look no further than Wiederholt's status on February 27, 2002, the day of the petition and accompanying affidavit. The remaining members of the Board do not believe it is necessary to decide the determination date of Wiederholt's petition for reinstatement because in their opinion Wiederholt should not be allowed reinstatement whether assessed as of February 27, 2002, or as of the final hearing before the Board in January of 2003. Looking at the last date possible, of course, afforded Wiederholt nearly an entire extra year of time for his continued maturation and development prior to the *Pier* review.

12. For example, counsel from the first petition hearing actually testified that Wiederholt's forgery incident "was blown completely out of context[,]" that he understood from Wiederholt's attorney in the disbarment proceedings that Wiederholt's legal arguments in the "satisfaction of judgment" incident were correct, and that he understood that the Bar had gone out of its way to solicit the "forgery" grievance so the Bar would have yet another grievance against Wiederholt [Tr. 106—107, 111]. He further testified that he believed Wiederholt met the qualifications for reinstatement at the time of the first petition [Tr., p. 114].

13. The Hearing Committee commented on this aspect of the testimony of the counsel from the first petition, but gave that testimony weight due to counsel's "reputation," a reputation that has no support whatsoever in the record. The Board declines to follow the Hearing Committee in this regard, especially in light of the testimony noted in the preceding footnote.

high burden of persuasion for all the same reasons set forth by the hearing committee, the Board and the Alaska Supreme Court in the first petition process.

25. It is telling that notwithstanding the Hearing Committee's ultimate recommendation that Wiederholt be readmitted to the practice of law, that recommendation was tempered by accompanying recommendations (1) that Wiederholt have a mentoring panel (made up of at least one of his lawyer witnesses at his hearing and at least one senior member of the Bar not acquainted with Wiederholt) meet with him at least quarterly for one year and report to the Board about "Wiederholt's practice, including specifically the matters which this Panel and prior Panels and the Alaska Supreme Court, felt relevant in determining his fitness to practice law[,]" and (2) that Wiederholt continue his formal counseling until the medical experts believe "it is not therapeutically beneficial any longer." [R. 417—418] (The Hearing Committee did not state what its readmission recommendation would have been in the absence of the accompanying recommendations, or what it believed would be the consequence of Wiederholt's failure to adhere to the accompanying recommendations if he were readmitted.) If the Hearing Committee truly had been "clearly convinced" that Wiederholt had met all of the standards for reinstatement, no accompanying recommendations would have been necessary. The accompanying recommendations reflect doubt about Wiederholt's qualifications for reinstatement, not conviction.

26. Moreover, in response to direct questions during the January 23, 2003, hearing before the Board, Wiederholt's counsel stated that Wiederholt would not agree to be bound by these additional recommendations, although Wiederholt would want to comply with them [Tr., p. 8—9]. Wiederholt himself stated to the Board that he was "cured" [Tr., p. 96], making it clear to the Board that he

believed he did not need continued formal counseling. This is not reconcilable with the Hearing Committee's recommendations.

27. The Board does not believe it is appropriate to readmit a disbarred attorney to the practice of law if there are oversight conditions of any kind.[14] It is not the duty or place of the Bar to give what only could be considered special treatment to a disbarred attorney. A disbarred attorney must make a higher showing, not a conditional showing, that he or she is worthy of re-admittance to the practice of law. It is inconsistent with the standards for readmission of a disbarred that readmission be granted subject to oversight conditions; a disbarred attorney either is eligible for reinstatement as an active attorney like any other attorney, or is not eligible for reinstatement.

28. The fundamental flaw in Wiederholt's current petition is time. Assuming *arguendo* that sometime after June 15, 2001, Wiederholt sincerely appreciated the nature of his misconduct, sincerely entertained remorse over his conduct, sincerely apologized to his victims, sincerely changed his views that his problems were the fault of the Bar, Bar Counsel, and others, sincerely undertook and completed an appropriate course of professional counseling, and sincerely believed he was at a stage of his life that he could deal with the pressures of being an attorney and all it entails, then Wiederholt finally is in the recovery stage. However, being in the recovery stage for a few months after all of the years in which Wiederholt was not in the recovery stage does not lend itself to a pronouncement of full recovery and qualification for reinstatement to the practice of law. In similar contexts, the recovery stage includes relapse and re-recovery, and only time will tell if full recovery will be made. Time matters, and not just the amount of time since disbarment without any consideration of the amount of that time actually spent in recovery.

14. The Hearing Committee tried to draw a distinction between its recommendation for reinstatement with the stated conditions and a recommendation for a supervised practice, stating that if the Hearing Committee had believed Wiederholt needed a supervised practice, it would not have recommended reinstatement. We see no such distinction, but, contrary to the dissent of Board member Matthew Claman, we certainly agree with the Hearing Committee that reinstatement subject to a supervised practice is not appropriate.

29. In light of the seriousness of Wiederholt's original misconduct and Wiederholt's conduct through the first petition process, conduct spanning a good number of years, the Board is *not* clearly convinced by the limited time of Wiederholt's alleged recovery that Wiederholt now has the moral fitness required for readmission or that his readmission would not be detrimental to the integrity and standing of the Bar or the administration of justice, or subversive of the public interest. Only additional time will tell.

## CONCLUSIONS OF LAW

1. Looking specifically at the relevant *Pier* review factors,[15] the Board concludes:

   (a) Wiederholt's original misconduct was very serious, as was his conduct during his first petition process;

   (b) At the time of his original disbarment hearings, Wiederholt had been admitted to the Bar almost 10 years and was not inexperienced, but his character and maturity levels were low, and that was demonstrated to be true during his first petition process, as well;

   (c) Other than his conduct relating to attempting readmission to the practice of law, there is no evidence of general misconduct since his disbarment;

   (d) The extent of Wiederholt's rehabilitation cannot be determined at this time because it is clear that his alleged recovery stage is of very limited duration, beginning no earlier than the late summer or early fall of 2001, after seven years of post-disbarment denial and failure to begin real recovery;

   (e) Wiederholt's acceptance and appreciation of his original wrongdoing and of his conduct during the first petition process, if it has occurred, occurred only recently, after seven years of post-disbarment denial;

   (f) Wiederholt's moral fitness cannot be determined because of the limited period of post-*Wiederholt II* time to truly evaluate his moral fitness, compared

with the numerous years of dishonesty preceding his recent (alleged) recovery; and

   (g) There is insufficient proof from the limited period of alleged recovery time that readmission to the practice of law would not be detrimental to the Bar and the judicial system, or subversive to the public interest.

2. Wiederholt has *not* met his burden of establishing by clear and convincing evidence, *i.e.*, that it is highly probable, that he currently possesses the requisite moral qualifications to practice law in Alaska, for the following reasons:

   (a) As of 1993—1994, during his disbarment proceedings, it became clear that Wiederholt was dishonest, for all of the reasons set forth by the hearing committee, the Board, and the Alaska Supreme Court;

   (b) During his first petition proceedings ending in June of 2001, it became clear that Wiederholt still was being dishonest with the Bar and the Court; and

   (c) The limited period of time that Wiederholt claims to have been in recovery is insufficient to overcome the earlier findings of dishonesty.

3. Wiederholt has *not* met his burden of establishing by clear and convincing evidence, *i.e.*, that it is highly probable, that his resumption of the practice of law would not be detrimental to the integrity and standing of the Bar or the administration of justice, or subversive to the public interest, for the following reasons:

   (a) Wiederholt was disbarred in 1994 for extremely serious misconduct occurring in the late 1980s and early 1990s;

   (b) During the disbarment proceedings, Wiederholt lied to Bar Counsel and lied under oath to the hearing committee;

   (c) During the disbarment proceedings, it was established that Wiederholt suffered from a personality disorder;

---

**15.** Restitution and competency factors are not relevant here, restitution not being an issue and

Bar Counsel not having contested Wiederholt's competency to practice law.

(d) After disbarment, Wiederholt did not undergo counseling for his personality disorder;

(e) Wiederholt sought readmission to the practice of law as soon as legally possible, when he simply was not ready;

(f) During the reinstatement hearing process before the hearing committee and the Board in 1999—2000, Wiederholt remained dishonest and continued to exhibit the personality issues that led to his disbarment in the first place;

(g) At no time from his disbarment in 1994 through the Alaska Supreme Court's decision in *Wiederholt II* did Wiederholt sincerely entertain any appreciation for the nature of his misconduct or any sense of remorse for that misconduct, and, indeed, all through that time, Wiederholt believed that (1) he had not done anything really wrong, (2) the Bar and Bar Counsel were the source of all of his problems, and (3) that he owed no apologies to anyone;

(h) At no time from his disbarment in 1994 through the Alaska Supreme Court's decision in *Wiederholt II* did Wiederholt undergo formal counseling for his personality disorder;

(i) Only after the *Wiederholt II* decision was issued did Wiederholt begin formal counseling for his personality disorder and begin making apologies to the victims of his misconduct, and it is clear that the only reason Wiederholt began these actions was because he believed he would not be reinstated in their absence; and

(j) In light of the nearly seven post-disbarment years of inappropriate attitude towards the Bar and the judicial system, the limited period of time of Wiederholt's alleged recovery is insufficient to make it highly probable that he has fully recovered and will not repeat his misconduct in the future, and therefore not be a threat to the Bar and the judicial system.

## RECOMMENDATION TO THE ALASKA SUPREME COURT

The Board recommends that Wiederholt *not* be readmitted to the practice of law in Alaska at this time.

Dated: May 6, 2003

/s/ Lori Bodwell, Chair
Disciplinary Board

/s/ Sheila Selkregg, Member
Disciplinary Board

/s/ Jonathon Katcher, Member
Disciplinary Board

/s/ Keith Levy, Member
Disciplinary Board

/s/ Daniel Winifree, Member
Disciplinary Board

## CONCURRING RECOMMENDATION

We concur in the final conclusion reached by the majority of the Disciplinary Board in this matter, but do so for somewhat different reasons. We believe the Hearing Committee performed an excellent job in reviewing Jon E. Wiederholt's petition for reinstatement. We believe that the Hearing Committee erred because it should have concluded from the facts it considered that, *at the time Mr. Wiederholt filed for reinstatement on February 27, 2002,* he was then not yet eligible legally or factually for reinstatement. We believe the Hearing Committee mistakenly concluded that Mr. Wiederholt had satisfied the criteria for reinstatement by assessing those standards on the basis of many facts which had only developed by the time the Hearing Committee reviewed the matter on October 8–9, 2002. In our belief, the assessment of eligibility turns on eligibility at the time a petition for reinstatement is filed and not on such subsequent events as might occur.

While our colleagues and others may consider a requirement that eligibility must exist at the moment a petition is filed to be overly technical, we do not believe that requiring eligibility at the time of filing the petition is merely technical. To conclude otherwise would encourage petitions before the Bar Association and elsewhere to be filed with the hope that subsequent events might relate

back and resuscitate an otherwise deficient petition. The logic of rejection of this notion as a policy matter is reflected, we believe, in the recent amendment to Bar Rule 29 wherein the earliest opportunity for a petition for reinstatement is now two years after a denial. The amendment to Bar Rule 29 is not specifically applicable to Mr. Wiederholt's situation, but the policy underscoring that amendment has application to an assessment of what facts a petition must be based upon.

Taking into account both the findings reached by the Hearing Committee and the representations made by Mr. Wiederholt himself to the Disciplinary Board on January 23, 2003, we are persuaded that, particularly at the time the petition was filed, Mr. Wiederholt demonstrated only that he had begun to undertake the remedial measures which the Alaska Supreme Court noted as critical when it rejected his first petition for reinstatement. *See, In re Reinstatement of Wiederholt*, 24 P.3d 1219, 1228–31 (Alaska 2001). We find little evidence that Wiederholt undertook apologies, psychological counseling and other remedial measures until the Court announced in its decision that he should have been doing this. Transcript of January 23, 2003, hearing at pp. 70–71. The fact that he subsequently engaged in apologies and the like prior to the meeting of the Hearing Committee deserves some commendation. However, actions for just seven months (between the *Wiederholt* decision and his petition) could not realistically have demonstrated sufficient rehabilitation and eligibility on the date he filed for petition. Mr. Wiederholt did not, in our opinion, prove rehabilitation within a mere seven months, and we do not believe a finding that he did would be logical.

As the Court noted in *Wiederholt*, Mr. Wiederholt did not take sufficient steps toward personal rehabilitation prior to arguing his case to the court to justify reinstatement. Such steps toward rehabilitation, in our opinion, had only barely commenced by the time he filed the instant petition. That is not sufficient to support a determination that, at the time of filing the petition, he was rehabilitated sufficiently to support reinstatement.

Dated: May 6, 2003

/s/ Robert M. Johnson, Member
Disciplinary Board

/s/ Lawrence Ostrovsky, Member
Disciplinary Board

## DISSENT

In the history of the Alaska Bar since statehood, the court has disbarred several attorneys from practicing law in Alaska. Jon Wiederholt was one of those attorneys. *See Wiederholt I,* 877 P.2d 765 (Alaska 1994). Of the disbarred attorneys, Wiederholt is the first to apply for reinstatement. In 1999, Wiederholt applied for reinstatement, and the court rejected this application. In *Wiederholt II,* 24 P.3d 1219 (Alaska 2001), the court articulated the standards for an application for reinstatement for the first time. More than 8 months after the court denied Wiederholt's first application for reinstatement on June 15, 2001, he re-applied for reinstatement on February 27, 2002. Approximately 11 months later, more than 19 months after the court denied his first application, and more than 8½ years after the court disbarred him, Wiederholt appeared before the Disciplinary Board as part of his second application for reinstatement.

Relying primarily on an insufficient passage of time, Bar Counsel opposed Wiederholt's second application for reinstatement. The court disbarred Wiederholt on July 8, 1994. The majority of the Board has agreed with Bar Counsel and has recommended that the court deny Wiederholt's application for reinstatement.

I believe that sufficient time has passed for purposes of Wiederholt's rehabilitation; the evidence introduced at the hearing, including the only expert evidence introduced during the hearing showed that Wiederholt does not present a risk to future clients; and the supreme court has both the inherent and explicit authority to reinstate Wiederholt's license conditioned on his practicing in a supervised practice setting for reasonable period. Accordingly, I dissent.

I recommend that the supreme court conditionally reinstate Wiederholt's license to practice law subject to a reasonable period of

mandatory supervision accepted by Wiederholt.

### Discussion

In considering issues surrounding licensed attorneys and the discipline of licensed attorneys, courts and other governing bodies rely on the body of cases in federal and state courts that address these issues. As Chief Justice Burger explained:

> When a court satisfies itself that an applicant possesses the requirements for admission to the bar, it does so by issuing an order that is no less judicial in nature than other decisions it renders. Its order is a certification to the public that the attorney possesses, in the words of our late colleague Justice Frankfurter,
>
> > those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as 'moral character.'

*In re Caplinger,* 49 U.S.L.W. 3862 (1981) (Burger, C.J., dissenting).

Scrutiny of applications for admission must not be a routine ministerial act, as another jurist has noted:

> Proceedings to gain admission to the bar are for the purpose of protecting the public and the courts from the ministrations of persons unfit to practice the profession. Attorneys are officers of the court appointed to assist the court in the administration of justice. Into their hands are committed the property, the liberty and sometimes the lives of their clients. This commitment demands a high degree of intelligence, knowledge of the law, respect for its function in society, sound and faithful judgment and, above all else, integrity of character in private and professional conduct.

*In re Monaghan,* 126 Vt. 53, 222 A.2d 665, 676 (1966) (Holden, C.J., dissenting).

Both our court, which has final authority in decisions involving applications for reinstatement, and the Board, acting in its statutory role as advisory board to the supreme court, have an obligation to carefully scrutinize all applications for reinstatement. The supreme court has identified 10 factors to consider in an application for reinstatement. *Wiederholt II,* 24 P.3d at 1224–25 (citing *In re Pier,* 561 N.W.2d 297, 300 (S.D.1997)). Alaska Bar Rule 29(c)(1) provides three primary factors: competency, knowledge of law, and moral fitness.

There can be no question that the standard, or "bar", that new applicants must pass for initial admission to the bar is, in effect, lower than the standard that a disbarred attorney must pass to gain re-admission. Nevertheless, the standard for re-admission cannot be so high that it is impassable.

Because Wiederholt is the first disbarred attorney to apply for re-admission, and because the supreme court rejected his first application for re-admission, the supreme court has never ruled on the extent of its power to impose conditions for reinstatement following disbarment. I believe one critical issue in this area is whether the court has the authority to impose conditions on a bar license that, in effect, place the successful applicant for re-admission on a supervised or probationary practice for a specific period of time.

In the criminal context, which is analogous, the court has long recognized the importance of rehabilitation. *See State v. Chaney,* 477 P.2d 441 (Alaska 1970). Our constitution emphasizes the importance of reformation. Alaska Constitution Art. I, § 12. Although a disbarred attorney is not convicted of a crime when the supreme court disbars him, the disbarment remedy is a penal sanction. In Wiederholt's case, the course of conduct that brought him before the disciplinary board in the first place warranted disbarment. Supervised practice would, in effect, require Wiederholt to associate with another attorney who would formally accept responsibility for supervising and reviewing Wiederholt's work on a regular basis. A supervised practice condition would effectively prohibit Wiederholt from returning to solo practice.

The Hearing Committee unanimously concluded that Wiederholt had met the standards for reinstatement and recommended reinstatement. This Board considered much of the same evidence as the Hearing Com-

mittee. In fact, the only additional evidence was Wiederholt's responses to questions posed by the Board.

Crucial evidence in this matter is the opinion of Dr. Aaron Wolf, an established psychiatrist in Anchorage who evaluated Wiederholt and provided psychotherapy and counseling to Wiederholt. Dr. Wolf concludes that Wiederholt does not pose a risk to his clients and that Wiederholt does not need regular psychotherapy. Dr. Wolf supports Wiederholt's reapplication. Despite its knowledge of Dr. Wolf's opinion, Bar Counsel, which opposes reinstatement, did not take steps under Alaska R. Civ. P. 35 to obtain a second opinion regarding Wiederholt's psychological condition and whether he presents a risk to future clients.

As an attorney who has represented numerous clients in both civil and criminal matters in which psychiatric opinions are critical to the court's final decision, I believe that the lack of any expert opinion that suggests that Wiederholt presents a risk to future clients is a substantial weakness in the arguments opposing reinstatement.

The reliance of both Bar Counsel and the majority of this Board on the passage of time, alone, as a factor against Wiederholt is troubling. For some individuals, rehabilitation and reformation occurs in a rapid time period. For others, rehabilitation and reformation is a life-long process. The evidence presented shows that Wiederholt has made substantial progress toward rehabilitation and that he understands the behavior and issues that led to his disbarment. While the court must establish a high standard for re-admission following disbarment, the court should not require such an applicant to pass a test for sainthood.

Finally, the record of evidence presented regarding Wiederholt's present condition from non-expert witnesses, including family, friends, and lawyers from the community, overwhelmingly supports Wiederholt's application. The evidence relied on by the majority of this Board in recommending that the supreme court deny reinstatement is based on his prior conduct that led to disbarment

and his timing in apply for reinstatement. Viewing the evidence in light of the *Pier* factors, it appears that Wiederholt has sought to satisfy these 10 factors, and the Board has then responded by explaining that Wiederholt's effort to satisfy these factors is simply not good enough.

In short, I believe the majority is looking for reasons to deny Wiederholt's re-application for re-admission in light of compelling and largely uncontradicted evidence that supports his readmission.

### Conclusion

The sanction of disbarment is a remedy that is appropriate in the most egregious cases. Wiederholt's prior conduct fully justified his 1994 disbarment. Without some ability to supervise a formerly disbarred attorney's return to practicing law-either through administrative supervision (which is not possible in this jurisdiction given the lack of a supervising agency) or supervised practice by a licensed attorney-it may be difficult for any hearing board or court to permit a disbarred attorney to return to regular practice. Nevertheless, the rules should not permit the re-admission of disbarred attorneys unless the court is prepared to re-admit disbarred attorneys who have proven that they are fit to practice. By allowing a disbarred attorney to return to practice in a supervised setting, the court can provide for reasonable supervision of a disbarred attorney in the early years of his re-admission to practicing law.

Accordingly, the court should reject the majority's recommendation and approve Wiederholt's re-application for re-admission subject to a reasonable period of supervised practice.

Dated: May 6, 2003

/s/ Matthew Claman, Member
Disciplinary Board

CARPENETI, Justice, dissenting.

Disbarred attorney Jon Wiederholt seeks, for a second time, reinstatement to the Alaska Bar Association. After a two-day hearing, the Area Hearing Committee[1] unani-

---

1. The Hearing Committee consisted of attorneys

Clay A. Young (chair) and Larry D. Wood and

mously recommended his reinstatement. The matter then proceeded to consideration by the Disciplinary Board,[2] which put questions to Mr. Wiederholt and heard argument by counsel. A divided Disciplinary Board recommended against reinstatement.[3] The matter now proceeds to this court for final decision. Because I would grant the petition for reinstatement, I dissent from to day's summary denial.

Wiederholt was disbarred in July 1994.[4] He sought reinstatement in June 1999.[5] The Hearing Committee recommended against reinstatement on the grounds that Wiederholt had not shown himself to be morally fit to be readmitted and that his readmission would be detrimental to the bar, the administration of justice, and the public interest.[6] The board unanimously agreed.[7] We agreed with the board and denied reinstatement.[8]

Our decision denying reinstatement to Wiederholt, after noting the seriousness of the conduct that resulted in disbarment, relied heavily on two factors—Wiederholt's lack of remorse for his acts and his failure to take remedial measures recommended by both the board and this court—in concluding

that he had not demonstrated moral fitness for reinstatement.[9] Moreover, in assessing whether he had proven that his reinstatement would not be detrimental to the bar, the administration of justice, or the public interest, we relied on factors that demonstrated his own understanding of the harm he had caused and his personal response to his acts and his resulting disbarment. We upheld the board's findings that "Wiederholt's lack of remorse, lack of consciousness concerning his past wrongdoing, failure to accept responsibility for his actions, and his tendency to justify and minimize his past behavior provide strong evidence that he could again engage in similar activity in the future." [10]

Our decision was originally issued on April 27, 2001 and, after a petition for rehearing,[11] was re-issued in June 2001. On February 27, 2002 Wiederholt petitioned a second time for reinstatement.

The question whether the Disciplinary Board should give any deference to the findings of the Hearing Committee is a close one. Bar Rule 10 gives the board the power to

---

non-attorney Debra Anderson.

**2.** The Disciplinary Board consisted of Lori Bodwell (presiding), public member Sheila Selkregg, and attorneys Matthew Claman, Robert Johnson, Jonathon Katcher, Keith Levy, Lawrence Ostrovsky, and Daniel Winfree.

**3.** The board's principal recommendation was joined by five members: Bodwell, Selkregg, Katcher, Levy, and Winfree. Two members, Johnson and Ostrovsky, concurring separately, stated that they looked only to the time between this court's decision denying reinstatement and the date that Wiederholt filed his second petition for reinstatement. Claman dissented, stating that he would grant reinstatement with conditions.

**4.** *In re Wiederholt*, 877 P.2d 765 (Alaska 1994) (*Wiederholt I*).

**5.** *In re Reinstatement of Wiederholt*, 24 P.3d 1219 (Alaska 2001) (*Wiederholt II*).

**6.** *Id.* at 1222.

**7.** *Id.*

**8.** *Id.* at 1235.

**9.** We concluded the section concerning moral fitness in this way:

> The record supports the board's conclusion that Wiederholt has not proven his moral fitness by clear and convincing evidence. Wiederholt's testimony, in which he blames this court and the Alaska Bar Association for his problems and attempts to justify and minimize his actions, shows that he fails to understand the extent and significance of his previous misconduct.
> *Id.* at 1231.

**10.** *Id.* at 1232.

**11.** Wiederholt, while "accept[ing] the conclusions set forth in the Opinion," asked us to strike certain language and remand for further evidentiary findings. *In re Wiederholt*, Memorandum in Support of Petition for Rehearing, S–9171 (May 2, 2001). We did strike the disputed language but otherwise provided no relief.

This is not a major point, but I mention it and note Wiederholt's "acceptance" of our conclusions because the Disciplinary Board gave great weight to the short period of time that elapsed between our decision denying reinstatement and Wiederholt's second petition for reinstatement. In fact, that period was ten months, not seven and one-half months, as argued by counsel for the Bar Association.

"review and modify the findings of fact" of the Hearing Committee, which suggests that it is not required to defer to the Hearing Committee with regard to findings. But the Hearing Committee saw and heard all of the witnesses while the Disciplinary Board did not.[12] Because this court reviews the board's recommendations *de novo*, and because the board saw and heard none of the witnesses except Wiederholt, I am not inclined to give to the board's factual findings the "great weight" we customarily give to them,[13] to the extent that they are based on an assessment of witness credibility.

My conclusion that Wiederholt's petition should be granted rests heavily on (1) Wiederholt's striking change in attitude toward his offenses, toward their effect on others (including his clients, opposing counsel, the bar association, and the administration of justice), and toward his responsibility to change his conduct and make up for it; (2) the concrete steps that Wiederholt has undertaken to acknowledge his culpability and to reform himself so as to not present a danger of violating ethical standards in the future; (3) the remarkable efforts he has made to contribute to his community, which appear to have given him insights that he was simply in capable of in 1994 and 1999; and (4) several fundamental flaws in the Disciplinary Board's decision. It is true that he moved with almost unseemly haste in petitioning for reinstatement a second time, but my review of the transcripts of the evidentiary hearing before the Area Hearing Committee and of the hearing before the Disciplinary Board firmly convinces me that he meets the standards that we have previously set. While the appearance might have been better for Wiederholt had he taken longer to bring his case for reinstatement, he should be reinstated if he meets the standards. I believe that he does.

The following paragraphs set out just the most important evidence that supports the four principal rationales for reinstating Wiederholt mentioned in the previous paragraph.

They do not purport to cover all of that evidence.

### 1. *Changes in attitude*

Wiederholt's testimony before the Hearing Committee in October 2002 offered a stark contrast to his earlier appearances in the 1990's:

- Near the outset of his testimony before the Hearing Committee, Wiederholt noted that his "personal arrogance and pridefulness" were largely responsible for his conduct and his "inability to accept unqualified responsibility for that conduct."

- Near the end of his testimony, Wiederholt stated: "I am desperately ashamed of the person that required the Bar's response some ten years ago. I am ashamed of the legacy that, in some sense, I will leave imprinted forever on volumes of court report[s]. I'm ashamed of the . . . notoriety that just my name takes with . . . the Bar Association."

Wiederholt's attitudinal changes extended to his views of opposing counsel:

- "One of the things lawyers are supposed to do is not make situations worse, . . . whether for their clients or needlessly for opposing counsel."

- He characterized his acts in the *MV Constructor* matter, in which he had engaged in discovery violations, as "obstreperous" and condemned "the method by which I made life difficult for opposing counsel."

- Wiederholt characterized his actions with regard to the incident with Mr. Maloney (opposing counsel with whom he was involved in an altercation and whom he kicked): "I had a petulant, childlike, unprofessional response to a matter that could have been defused, or certainly handled a great deal more professionally, and with more personal detachment. . . . It was wrong then, it remains

---

**12.** Only Wiederholt appeared before the board, and only for the purpose of answering questions that the board might have. The board did not view his full testimony and, of course, neither saw nor heard any of the seventeen other witnesses who appeared before the Hearing Committee.

**13.** *Wiederholt II*, 24 P.3d at 1222.

wrong now. And I have no justification for it beyond [a] childish, petty sort of response to a confrontation."

Wiederholt's attitude toward the bar association was markedly different than in his earlier proceedings:

- In the 1999 proceedings, when Mr. Van Goor of the bar association asked Wiederholt if he had apologized to his former client, Mr. Metcalf (the victim in a forgery matter), Wiederholt responded that he doubted that any apology would have been accepted. In 2002, Wiederholt raised that answer without prompting before the Hearing Committee and then added, "And I was wrong in that regard, too."

- Far from disparaging or attacking Mr. Van Goor as he had done in the earlier proceedings, Wiederholt directly apologized to him after earlier stating, "I can look to[,] I think[,] Mr. Van Goor, and[,] I think[,] the Bar, as ... an ally, if I'll give them that opportunity, and, as a recovering arrogant, prideful person, I think that I have resources, that I don't have to do it all on my own."

2. *Concrete steps*

In a number of ways, Wiederholt acted concretely both to acknowledge his culpability and to reform himself:

- He apologized to each of the persons that he had offended or victimized in the incidents that brought him before the bar association.

- He arranged for and participated (for approximately 18 months as of the time of the hearing) in a program of monthly psychiatric counseling with the psychiatrist who had first evaluated Wiederholt at the Bar Association's request in 1990 and 1991. The psychiatrist testified that, in his opinion, Wiederholt is truly changed, understands that his actions that led to his disbarment were wrong, and does not present a danger to reoffend.

- He continued to counsel monthly with Dr. Gilchrist, his pastor, following *Wiederholt II,* and for the period that Gilchrist was out of the country, he met with Chris English, a counselor on the staff of his church who was recommended by Gilchrist.

- While not all of the evidence was new, there was testimony from several members of the bar that Wiederholt had sought guidance from them and had genuinely appeared to change as a result of the entire experience. Terry Aglietti, for example, testified that "in Mr. Wiederholt's case the practice of law in his younger days brought out the worst elements in his personality. I don't see that in him now. I mean it's tragic that all these things had to happen in order for him to learn that there's a better person inside of him than the person that was doing those things. But I believe that that has happened, and I believe that he would be a valuable addition to the legal community." Later the same witness stated, "I think that Mr. Wiederholt had an epiphany at some point where things sort of shifted in his mind. And whether that was the result of the cumulative effect of the various proceedings that he had gone through, or something that his minister said to him, something that Mr. Erwin said to him—I don't know. ·But I believe that the glasses through which Mr. Wiederholt views the world, lawyers, and the practice of law, are a lot different prescription than they were when he committed the acts for which he was disbarred."

3. *Community Contributions*

Wiederholt made very significant contributions to the community to compensate for the wrongs he had committed. These contributions appear to have significantly improved his outlook on life.

- Most significantly, he obtained training and certification as an Emergency Medical Technician (EMT),[14] volunteered his

---

**14.** In relation to the "timing" issue discussed below, it is noteworthy that Wiederholt commenced his EMT activities after his first petition for reinstatement was filed. He enrolled in the EMT course at the University of Alaska, Anchorage, in August 1999 and began volunteering as an EMT in January 2000.

services, became heavily involved in that activity, was promoted to an EMT II, moved his residence to be closer to the area where he served and, according to the testimony offered by several people, has rendered invaluable service to the provision of emergency services in his community. A co-worker testified to the personal sacrifices that Mr. Wiederholt made routinely in the course of responding to calls and noted that "[o]ur patients have shown nothing but trust for him.... He has a very gentle, tender, caring way to help them get through a very traumatic time for them." She testified about a twelve-year-old boy who was badly injured in a jet ski accident and who was hospitalized for almost two months. Wiederholt visited him regularly in the hospital after being involved in his rescue. Wiederholt estimated that he had devoted 2000–2500 hours to EMT activities [15] and he stated that "in no small measure I'm hoping that ... it gives me a chance to pay back significantly ... I'm hoping that in some sense it ... may right a wrong."

● It appeared that Wiederholt had been deeply affected by his EMT work, and he seemed to draw from it important lessons on how one should conduct oneself in the practice of law. For example, referring to "the most valuable thing it has taught me," he acknowledged that "one of my greatest failings [as an attorney] was my inability to see in the vast scheme the relative insignificance of ... battles, and in my case vicious battles, with opposing counsel .... I mean, one of the things I think lawyers have to do is be good caregivers." Analogizing to EMTs, he referred to "legal EMTs" and concluded that, in trying to solve a client's problems, the lawyer has a responsibility not to make a situation worse.

● Other volunteer efforts that represented constructive community activities included the following: Wiederholt, performing the role of Scrooge in Dickens's *A Christmas Carol,* assisted his pastor in illustrating points for the sermon on each of the Sundays in Advent; he also performed the role in a classroom at the request of a teacher regularly over a number of years; he volunteered with Special Olympics.

4. *Fundamental flaws in the Disciplinary Board's decision*

● The Disciplinary Board found that the only reason Wiederholt sought counseling, apologized to his victims, or otherwise showed remorse was because he believed it was the only way to become reinstated. At the outset, it seems problematic for the board to find fault with an applicant for doing precisely what this court held that he must do in order to be reinstated: seek counseling and apologize to his victims. And because our prior decision relied so heavily on Wiederholt's lack of remorse, it is to be expected that he would try to demonstrate his changed attitude in his petition for reinstatement. At a more fundamental level, I believe that the evidence supports the Hearing Committee's conclusion that Wiederholt experienced a genuine and profound transformation in his outlook toward the profession and his responsibilities to it, to society, and to his clients. Part of that transformation involved his realization of the harms he had caused to others and his genuine remorse for causing that harm.

● The Disciplinary Board relied on a 1992 diagnosis of paranoid personality disorder and related expert testimony to the effect that persons suffering from this disorder were "not likely to change significantly." That testimony also included the generalization that such persons "may terminate therapy prematurely." But the psychiatrist who offered the diagnosis and related testimony in 1992 testified in 2002 that Wiederholt had subsequently counseled faithfully with him for sixteen months. He also testi-

**15.** While the great majority of the time was volunteered, the Mat–Su Borough paid $7/hour for time when EMTs were actually on a "run" and, shortly before the hearing, had begun to pay for shifts.

fied, in the words of the Area Hearing Committee, that Wiederholt had undergone "a substantial amount of maturing and growth," and said he "has seen a major change in [Wiederholt]." He believed that "Mr. Wiederholt really is remorseful for his misconduct, and knows that what he did was wrong." This same expert, who in 1992 noted that persons suffering from Wiederholt's disorder were unlikely to change significantly, testified in 2002 that Wiederholt's attitude had "changed substantially, and I don't see it changing again. . . . I think he's found a way of life that's really very comfortable for him." Finally, he testified that Wiederholt no longer needed counseling. Moreover, the board heard no expert testimony, or any testimony at all, to the contrary.

In these circumstances, it seems highly questionable for the board to rely on a generalized statement that persons with a particular disorder "are not likely to change significantly" when the author of that statement flatly testifies ten years later that the person in question *has* changed significantly. The board on a number of occasions even cited Wiederholt's actions in attempting to comply with this court's decision in *Wiederholt II* as evidence of his personality disorder. While such an approach seems questionable to begin with, it seems particularly inappropriate given the expert's uncontradicted opinion that Wiederholt has, in fact, changed. Thus, for example, the board faulted Wiederholt for starting counseling the month after our opinion in *Wiederholt II* and for apologizing to his victims, finding that in doing so he acted "consistent[ly] with the personality disorder ascribed to him." The board entirely ignored the expert's opinion that Wiederholt had changed in the ten years that had passed since the time of his original diagnosis.

The unfairness of this approach can be seen in the board's third conclusion of law. In applying the fifth *Pier*[16] factor, the board concluded: "*Other than his conduct relating to attempting readmission to the practice of law,* there is no evidence of general misconduct since [Wiederholt's] disbarment." In other words, the board somehow found Wiederholt's immediate commencement of counseling and his apologies to his victims—which this court criticized him for failing to do in *Wiederholt II*—to be "general misconduct." Such a perverse conclusion can follow only because the board ignored the expert's uncontradicted opinion that Wiederholt *had* changed in the ten years that intervened between his original diagnosis and his current testimony. (Indeed, even absent this transformation, it is inexplicable to cite a party's efforts to comply with our decision as evidence of a personality disorder.)

- Finally, the board erred in concluding that the Hearing Committee recommended reinstatement only upon conditions and in concluding that Wiederholt refused to accept any conditions on his reinstatement. These issues were confused by uncertainty over what the law allows. Viewing the parties' positions in that context, it is clear that Wiederholt did not refuse to accept conditions.

Wiederholt, his counsel (Canterbury), and counsel for the bar association (Van Goor) all believed that this court would not allow conditions to be placed on reinstatement if they had not been included in the Order of Disbarment. In fact, it was Van Goor who forcefully made this point in his opening argument and reiterated it under questioning from the board. Van Goor stated, "I will tell you that based on the *Cavanaugh* case, unless that reinstatement was a part of the original disbarment order, the Court will not approve it." Any ambiguity on Canterbury's part was likely due to the fact that Van Goor had argued forcefully that no conditions could be imposed.

**16.** *In re Pier,* 561 N.W.2d 297 (S.D.1997). In *Pier,* the Supreme Court of South Dakota summarized the required considerations for reinstatement in various jurisdictions. The fifth "*Pier* factor" is the petitioner's conduct following the discipline. *Id.* at 301. This court adopted *Pier* in *Wiederholt II,* 24 P.3d 1219, 1224–25 & n. 27 (Alaska 2001).

Returning to the two errors that the board made regarding conditions, the first was in characterizing the Hearing Committee as being equivocal about reinstatement because it recommended conditions upon reinstatement. But a review of the Hearing Committee's recommendation reveals no reservations in its recommendation. It is clear, forthright, and direct. The committee found by clear and convincing evidence that Wiederholt possesses the requisite moral qualifications to practice law, and it found by the same high standard that "he will not repeat his misconduct in the future."

The board's second error was in mistakenly concluding that Wiederholt objected to conditions upon his reinstatement. This conclusion is contradicted by the transcript of the hearing. The primary condition at issue was the recommendation that Wiederholt meet quarterly with a mentoring panel. Wiederholt agreed to continue meeting with a mentoring panel even though the Area Hearing Committee explicitly noted that this condition was *not* a recommendation of supervised practice. Wiederholt even agreed to a condition of supervised employment, a condition expressly rejected by the committee (though he noted that it would be difficult to obtain employment under a supervising attorney given his history of disbarment). Finally, Canterbury told the board that Wiederholt would not argue that this court lacks authority to impose supervision. While neither Wiederholt nor Canterbury explicitly asked the board to reinstate him with conditions, it appears that all parties were acting under the belief that this court would not allow reinstatement under conditions. When pressed about whether Wiederholt would contest the conditions, both he and his counsel indicated that they would not. It is not reasonable to expect anything more given en the context of this discussion. In my estimation, the board unfairly characterized Wiederholt's comments as a refusal to accept reinstatement with conditions. This is particularly so in the context of a hearing in which bar ˙counsel forcefully argued that conditions could not be imposed in any event.

The primary thrust of the bar association's opposition to the petition for reinstatement, which view was adopted by the majority of the Disciplinary Board, was that insufficient time had elapsed between our decision in *Wiederholt II* and Wiederholt's second petition for reinstatement. It is a short period.[17] On first glance, one may well look skeptically at Wiederholt's case. But for two reasons I believe that the time issue is not fatal to Wiederholt's petition.

First, I believe that looking only to the time period between publication of our opinion denying reinstatement and the filing of the second petition for reinstatement is artificial. Our opinion was issued two years after the first petition was filed. During the time after the first petition was filed but before our decision on it was published, Wiederholt decided to pursue EMT training, completed the training, and began his volunteer career. About the time that the decision came out, Wiederholt was in the process of obtaining his advanced EMT certification and beginning his work with the EMT service of the Mat–Su Borough. In concluding that "not enough time has passed," the board literally looked to the eight-month period from June 2001 (the date of the re-issued *Wiederholt II* opinion) to February 2002 (the date of the second petition for reinstatement). But this approach ignores the period between June 1999, when the first petition was filed, and the date of publication of *Wiederholt II.* Substantial changes were taking place in Wiederholt's life during that lengthy period.

Second, and more importantly, after a review of the testimony, I have concluded that Wiederholt has met the high standards that

---

17. It was exactly ten months from issuance of the first opinion on reinstatement to filing of Wiederholt's second petition for reinstatement. *See supra* note 11. But because of the time that the process requires, the first opinion itself was issued almost two years after the petition was filed.

**800**

we determined in *Wiederholt II* that the law imposes for reinstatement. Other than allowing the board (and this court) to consider "the time elapsed since the original discipline,"[18] those standards do not prescribe any particular waiting period.[19] Almost ten years have elapsed since the original discipline in this case was imposed. Because Jon Wiederholt has met the standards for reinstatement, I believe that his petition for reinstatement should be granted.

---

**18.** *Wiederholt II*, 24 P.3d at 1225.

**19.** We have since adopted a two-year waiting period after a failed petition for reinstatement and the filing of a subsequent petition, Alaska Bar Rule 29(b), but all parties agree that the new rule does not apply to this case.