NOTICE

*The text of this opinion can be corrected before the opinion is published in the* Pacific Reporter. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

# IN THE COURT OF APPEALS OF THE STATE OF ALASKA

R.A.,

                    Petitioner,

          v.

STATE OF ALASKA,

                    Respondent.

Court of Appeals No. A-14264
Trial Court No. 3KN-22-01012 CR

O P I N I O N

No. 2776 — May 24, 2024

Petition for Review from the Superior Court, Third Judicial District, Kenai, Lance Joanis, Judge.

Appearances: Lacey Jane Brewster (petition) and George W.P. Madeira (briefing), Assistant Public Defenders, and Terrence Haas, Public Defender, Anchorage, for the Petitioner. Nancy R. Simel, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for the Respondent.

Before: Allard, Chief Judge, and Harbison and Terrell, Judges.

Judge ALLARD.

The United States Supreme Court has recognized a "significant constitutionally protected liberty interest in avoiding the unwanted administration of

antipsychotic drugs."[1] The Alaska Supreme Court has gone further and has held that given Alaska's more protective constitutional guarantees of liberty and privacy, the right to refuse to take antipsychotic drugs is "fundamental."[2]

In *Sell v. United States*, the United States Supreme Court articulated a four-part test that must be met before a court can authorize the involuntary medication of an incompetent criminal defendant for the sole purpose of rendering them competent to stand trial.[3] This test requires the State to prove by clear and convincing evidence that: (1) there are "*important* governmental interests at stake"; (2) "involuntary medication will *significantly further* those concomitant state interests" in that "administration of the drugs is substantially likely to render the defendant competent to stand trial" and "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense"; (3) "involuntary medication is *necessary* to further those interests," *i.e.*, "any alternative, less intrusive treatments are unlikely to achieve substantially the same results"; and (4) "administration of the drugs is *medically appropriate*, *i.e.*, in the patient's best medical interest in light of [their] medical condition."[4] The *Sell* Court emphasized that, under this test, orders authorizing involuntary medication solely for restoration of competency "may be rare."[5]

---

[1] *Sell v. United States*, 539 U.S. 166, 178 (2003) (cleaned up) (quoting *Washington v. Harper*, 494 U.S. 210, 221 (1990)).

[2] *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 248 (Alaska 2006).

[3] *Sell*, 539 U.S. at 180-81.

[4] *Id.*

[5] *Id.* at 180.

The current case involves a defendant who is charged with murder and has been found to be incompetent to stand trial. R.A.[6] is charged with first-degree murder, second-degree murder, manslaughter, and tampering with evidence for allegedly killing his mother in September 2022.[7] After finding R.A. incompetent to stand trial, the superior court ordered him committed to the Alaska Psychiatric Institute (API) for restoration. Antipsychotic medication was prescribed, but R.A. refused to take the medication voluntarily. The State subsequently filed a motion seeking to involuntarily medicate R.A. under *Sell.* The superior court held a four-day *Sell* hearing in which R.A.'s treating psychiatrist and a forensic psychologist testified at length.

Following the hearing, the superior court issued an order authorizing API to involuntarily medicate R.A. in an effort to restore him to competency. R.A. petitioned for review of the *Sell* order. Because postponement of review could result in impairment of R.A.'s fundamental right to refuse psychotropic medication, we granted the petition and ordered briefing.[8] For the reasons explained in this opinion, we now affirm the superior court's *Sell* order.

---

[6] Initials have been used to protect the privacy of the petitioner.

[7] AS 11.41.100(a)(1)(A), AS 11.41.110(a)(2), AS 11.41.120(a)(1), and AS 11.56.610(a)(1), respectively.

[8] Alaska R. App. P. 402(b)(1); *see also Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 248 (Alaska 2006) (holding that the right to refuse to take psychotropic drugs is "fundamental" under the Alaska Constitution).

*Factual background and prior proceedings*

On September 6, 2022, R.A.'s sister called the police and asked them to perform a welfare check on their mother. When the police went to the home, they discovered the mother's deceased body in the front entryway, covered with blankets. The victim had suffered three gunshot wounds and multiple stab wounds, including slicing wounds that severed her spine and nearly decapitated her.

R.A., who was twenty years old at the time, was discovered lying in a bed under blankets at the rear of the house. While being detained, he spoke in nonsensical statements. He was subsequently transported to a correctional facility. The Department of Corrections records from the time indicate that R.A. was "guarded" and "hostile" and behaving oddly. He was prescribed 10 milligrams of olanzapine (Zyprexa), an antipsychotic medication, to be taken twice daily, but he refused to take the medication.

R.A.'s attorney requested a competency evaluation, which was unopposed by the prosecutor. Dr. Lesley Kane, a forensic psychologist at API, subsequently issued a competency report in which she diagnosed R.A. with schizophrenia and opined that he was not competent to stand trial. The report noted that R.A. had been evaluated for competency twice within the past thirteen months (for other alleged offenses) and that each of the competency evaluations had concluded that he was not competent to proceed. The report also noted that he had been previously admitted to API in April 2020, September 2021, and June 2022. His medical records showed that he was largely non-compliant with his prescribed medications but that he had been given a crisis medication during his September 2021 stay and he had voluntarily taken two medications — aripiprazole (Abilify), an antipsychotic medication, and hydroxyzine, for anxiety — for a few days during his June 2022 stay. None of his previous stays at API had lasted more than five days.

Dr. Kane noted in her report that R.A.'s verbalizations during the competency interview were fragmented, disorganized, and nonsensical, and that he expressed delusional beliefs. She indicated that he "did not demonstrate an adequate

understanding of the court process at the time of the interview" and that "his mental illness impedes his capacity to engage in rational, meaningful conversation." Dr. Kane concluded that R.A. was not competent to stand trial, but that there was "substantial likelihood that [he] can be restored to competency within a reasonable period if he were to receive inpatient competency restoration services, including psychotropic medication and competency related education."

After finding R.A. incompetent, the superior court issued an order committing him to API for a period of up to ninety days for further evaluation and treatment. Because of a lack of bed space at API, the ninety-day commitment period expired while R.A. was still on the waiting list. R.A.'s attorney moved to dismiss his case under *J.K. v. State* because R.A. had not been transferred to API on a timely basis.[9] The superior court denied the motion to dismiss and ordered a second ninety-day commitment period.

R.A. was transferred to API in June 2023. A month later, Dr. Kane issued an updated competency report. Dr. Kane reported that R.A. refused to meet with her and that he remained incompetent. Dr. Kane noted that R.A. was unable "to engage in any meaningful conversation, as most of his responses and statements [were] nonsensical and off topic." Dr. Kane further noted that R.A. was not participating in restoration services and was refusing medication. She opined again that there was a substantial likelihood that he could become competent if he agreed to take the prescribed medication.

The court held a hearing shortly before the second period of restoration commitment was to expire. The court acknowledged that it could only order a third period of restoration under AS 12.47.110(b) if it found that (1) R.A. presented a

---

9   *J.K. v. State*, 469 P.3d 434, 444-45 (Alaska App. 2020) (holding that it was a violation of the defendant's substantive due process rights when he was left to "languish in jail" for 100 days while waiting for admission to API).

substantial danger of physical injury to others, and that (2) R.A. was substantially likely to attain competency within a reasonable period of time.[10] R.A.'s attorney argued that these findings could not be made, and she asked the court to dismiss the case without prejudice.

Dr. Kane testified at the evidentiary hearing to determine if a third period of restoration was warranted. Consistent with her prior competency reports, she testified that R.A. had psychosis and that he remained cognitively disorganized with fragmented and nonsensical speech. She also testified that R.A. had not improved because "he has been unwilling to take medication."[11] She stated that medication was "the most important aspect of treatment for him because he has a psychotic disorder and he's going to continue to be disorganized [without medication]." Dr. Kane testified that API was preparing a petition to involuntarily medicate R.A. under *Sell v. United States*, and she opined that there was a substantial likelihood that he could be restored to competency within a reasonable period of time if he were medicated.

One of the investigating police officers also testified at the evidentiary hearing and the State submitted photographs of the crime scene that showed the victim's multiple gunshot wounds and stab wounds.

The court subsequently found that R.A. remained incompetent and that he presented a substantial threat of physical injury to others. The court noted that whether

---

[10] AS 12.47.110(b) ("If, at the expiration of the second 90-day period, the court determines that the defendant continues to be incompetent to stand trial, the charges against the defendant shall be dismissed without prejudice, . . . unless the defendant is charged with a crime involving force against a person and the court finds that the defendant presents a substantial danger of physical injury to other persons and that there is a substantial probability that the defendant will regain competency within a reasonable period of time, in which case the court may extend the period of commitment for an additional six months.").

[11] Dr. Kane testified that Roe took the first dose of medication he was prescribed but then refused the medication after that.

there was a substantial likelihood that R.A. would regain competency depended on the outcome of the *Sell* involuntary medication petition. The court therefore ordered the third restoration period (180 days) contingent on a *Sell* hearing to determine if involuntary medication would be ordered.

Prior to the *Sell* hearing, the State submitted a *Sell* petition from API. The report was co-authored by Dr. Kane and Dr. Christine Sawyer, who was R.A.'s treating psychiatrist at API. The report proposed involuntarily medicating R.A. with two antipsychotic medications: olanzapine (Zyprexa) at a maximum dose of 30 milligrams per day; and haloperidol (Haldol) at a maximum dose of 200 milligrams per day. The report also proposed medicating R.A. with diphenhydramine (Benadryl) to prevent any possible side effects and lorazepam (Ativan) for agitation, anxiety, and sleep.

The report went through the *Sell* factors that require medical expertise. First, the report stated that the proposed course of treatment was "medically appropriate" because R.A. displayed "symptoms of a psychotic disorder, including delusional beliefs and ideas of reference, emotional lability and perceptual disturbances." The "treatment of choice" for a psychotic disorder is antipsychotic medication.

Second, the report stated that "alternative, less intrusive treatments" were not available because antipsychotic medication is "essential to the effective treatment of psychotic disorders" and other forms of treatment — including education, psychotherapy, and behavioral interventions — "do not address the essence of the disorder and are unlikely to be successful." The report noted that R.A.'s participation in treatment programming was "very limited" because his psychotic symptoms prevent him from "engag[ing] in treatment in a meaningful manner." The report opined that "[a]ntipsychotic medications represent the best, if not the only, treatment likely to stabilize his illness."

Third, the report stated that the prescribed course of medication was "substantially likely" to restore R.A. to competency. The report acknowledged that it

was not possible to say with certainty how R.A. would respond because there were no records of R.A. having previously experienced "long-term treatment with a robust dose of an antipsychotic medication." But the report noted that "the majority of patients" with R.A.'s diagnosis and symptoms experienced an improvement in their symptoms. The report extrapolated that R.A.'s symptoms would similarly improve, thereby also improving his competency-related abilities. (The report acknowledged, however, that fixed delusions are more resistant to treatment.) The report concluded that "[t]here is a reasonable expectation that [R.A.]'s symptoms will improve with medications and that he could be restored to competency following a period of treatment that included a regimen of psychiatric medications." The report reiterated that "this is the only treatment that presents any significant likelihood of restoration."

Lastly, the report stated that any side effects will not "undermine the fairness" of a trial. The report noted that the most common side effects of antipsychotic medications typically did not entail a risk of serious harm. Instead, the most frequent side effects are so-called "nuisance" side effects — *e.g.*, stiffness, restlessness, dry mouth, and blurry vision — most of which could be addressed through other medication. The report acknowledged that there were more serious side effects — such as tardive dyskinesia — that were very harmful, although very uncommon. The report noted that the most serious side effects have become increasingly rare with the advent of the newer generation of antipsychotic medication. The report also noted that the therapeutic effect of antipsychotic medication is to improve thinking, and therefore that antipsychotic medication is likely to enhance, rather than undermine, the fairness of any trial. The report emphasized, however, the need to carefully monitor the situation so that if concerns about side effects are raised, they can be addressed through the proper intervention.

*The Sell hearing*

The *Sell* hearing took place over four days. The authors of the *Sell* report, forensic psychologist Lesley Kane and treating psychiatrist Christine Sawyer, both testified at the hearing. This was the first time Dr. Sawyer had testified at a *Sell* hearing. Because she had no prior experience with competency restoration, the court qualified her as an expert in psychiatry but did not qualify her as an expert in forensic psychiatry. R.A.'s sister also testified.

Dr. Kane testified that for individuals like R.A. who suffer from psychosis, antipsychotic medication is a "necessary component of their restoration process." Dr. Kane testified that API experiences a "high" level of success in restoring individuals with R.A.'s diagnosis, although she noted that some defendants had delusions related to their cases and medication may not be helpful in those cases.

Dr. Kane testified that the primary impediment to restoration currently was R.A.'s disorganized thinking. She indicated that it was difficult to tell how much he understood about court processes because "he's too symptomatic or disorganized to be able to talk about it." Dr. Kane testified that the medication would make R.A. feel "more comfortable, less anxious, less paranoid" and would help him engage in conversation so they could assess what he actually knew and help him fill in educational gaps.

Dr. Kane testified that there was nothing in the record to suggest that R.A. would have an adverse or negative reaction to the medication. She acknowledged, however, that there was very little history to draw from as he had only been on antipsychotic medication for a few days. Dr. Kane did not find it surprising that his symptoms had remained when he had previously been on medication because a few days was not enough time for a significant difference to occur; instead, it generally took four to six weeks to see significant symptom improvement. Based on her experience with individuals with similar diagnoses and symptoms, Dr. Kane affirmed that there

was a substantial likelihood R.A. would be restored to competency if medicated with the prescribed course of treatment.

Dr. Sawyer testified similarly to Dr. Kane that antipsychotic medication was the preferred treatment for individuals with schizophrenia. She testified that her process of evaluating patients and recommending treatment did not vary from the civil to criminal context and she was primarily interested in the "best interests or health interest" of the patient. She noted that R.A.'s symptoms were affecting his ability to engage and opined that the medications would give him some relief from "just perseverating on one word" and would "help him with his thinking." She also asserted that the medications would help calm him and give him relief from his paranoia. She noted that R.A. had delusions that people were harming him and that medication "often" lifts such delusions. She acknowledged that delusions were less likely to be affected by medication if they had lasted for years, but she noted that R.A. (who was twenty-one years old at the time) "hasn't had that."

Dr. Sawyer explained why she had chosen the course of medication recommended in the *Sell* report. She noted the two antipsychotics, olanzapine (Zyprexa) and haloperidol (Haldol), would help calm him, relieve paranoia, and aid in his ability to communicate. She explained that she would not use the antipsychotics together but would base what she used on his reactions and the specific needs at the time. Dr. Sawyer said her recommendation was based, in small part, on her belief that R.A. had taken olanzapine (Zyprexa) previously. (This was incorrect; R.A. had taken aripiprazole (Abilify) during one of the API stays, which Dr. Sawyer also acknowledged.) She noted that haloperidol (Haldol), a typical antipsychotic, had different side effects than olanzapine (Zyprexa), an atypical antipsychotic, but that any side effects could get addressed by the antihistamine, diphenhydramine (Benadryl), she was ordering. Finally, she explained that she also was ordering a mood stabilizer, lorazepam (Ativan), to help with R.A.'s agitation.

Because she had not been qualified as a forensic psychiatrist and was unfamiliar with the competency procedures, Dr. Sawyer was not permitted to answer the question of whether she believed that R.A. was substantially likely to be restored to competency if involuntarily medicated. However, she was able to answer in the affirmative that, if involuntarily medicated, R.A. would be substantially likely to be able "to understand the proceedings against him" and able to "assist in his defense." Dr. Sawyer also testified that she held a "reasonable expectation" that R.A.'s symptoms would improve such that "he can understand the proceedings against him and assist in his defense at trial."

Dr. Sawyer acknowledged that this was her first *Sell* hearing and that she did not have much experience with forensic psychiatry — although she did have thirty years' experience as a psychiatrist, the majority of which involved working with state agencies and several years working in civil commitment. Dr. Sawyer also acknowledged that it was impossible to predict a patient's reaction to medication with certainty.

R.A.'s sister testified that she was concerned that forced medication would make R.A.'s symptoms worse. She testified that she thought he had been on olanzapine (Zyprexa) in the past and "he had lashed out even more" because he thought that he was being poisoned. She also expressed that it was very difficult to get R.A. to take medication because he thought she and their mother were imposters and he was concerned that they were poisoning him. She acknowledged, however, that she was not involved in his daily medication, and that "overall it was just up to him" to remain medication compliant.

Dr. Sawyer was called in rebuttal. She testified that R.A.'s sister's testimony confirmed that R.A. was taking medication only erratically and she opined that the symptoms that the sister believed had worsened because of the medication were instead symptoms of R.A.'s schizophrenia.

Following the hearing, the State and R.A.'s attorney submitted written closing arguments based on the testimony at the *Sell* hearing and the *Sell* report that had previously been submitted.

The State argued in its closing argument that all four *Sell* factors had been met by clear and convincing evidence. As already explained, these factors require the State to prove by clear and convincing evidence that (1) it has an "important" interest at stake; (2) involuntary medication will "significantly further" that interest; (3) involuntary medication is "necessary" to further the government's interest; and (4) administration of psychotropic medication is "medically appropriate."[12]

The defense attorney argued that the second *Sell* factor — that involuntary medication will "significantly further" the government's important interest[13] — had not been met because the State had failed to show that R.A. was "substantially likely" to be restored to competency if involuntarily medicated. The defense attorney criticized the State for not having a forensic psychiatrist testify, and the attorney argued that Dr. Sawyer's testimony should be discounted because she was not familiar with the test for competency. The attorney also argued that Dr. Kane's testimony should be discounted because she was a forensic psychologist, not a forensic psychiatrist. Lastly, the attorney argued that the State had only shown what the "general" effects of antipsychotic medication would be, and the State had failed to show how R.A. in particular would respond. The attorney emphasized that R.A.'s sister testified that medication had made him worse.

---

[12] *Sell v. United States*, 539 U.S. 166, 180-81 (2003).

[13] *Id.* at 181.

*The superior court's oral ruling*

The superior court issued its decision orally on the record outside the presence of the parties. The court based its ruling on the testimony at the *Sell* hearing, the *Sell* report co-authored by Dr. Kane and Dr. Sawyer, and the testimony and exhibits from the prior competency evaluations and findings. In its ruling, the superior court summarized the testimony and quoted at length from both the State's and the defense's closing. The court specifically adopted the State's pleadings as its findings and also adopted the prior *Sell* report "to the extent [it is] similar and add[s] some information." The court made clear that its findings were by clear and convincing evidence.

The court found that Dr. Kane and Dr. Sawyer were credible witnesses. The court noted that Dr. Sawyer was a psychiatrist who was qualified to testify about which medications affect psychiatric symptoms and how those symptoms can be ameliorated, while Dr. Kane was a forensic psychologist who was qualified to testify about which psychiatric symptoms affect competency. The court noted that both experts had, through their testimony and prior report, supported a finding that there was a substantial likelihood that R.A. would be restored to competency if he were involuntarily medicated. The court also agreed with the doctors that involuntary medication appeared to be the only way that R.A. would be restored to competency.

The court discounted R.A.'s sister's testimony that medication had made R.A. worse in the past, noting that the sister did not administer the drugs and therefore did not know whether R.A. was taking them regularly — which it appeared he was not. The court then suggested R.A. had previous positive experience with at least one of the medications recommended in the *Sell* report. (The court appears to have conflated Dr. Sawyer's inaccurate testimony that R.A. had previously been on olanzapine (Zyprexa) with Dr. Kane's accurate testimony that R.A. had voluntarily taken aripiprazole (Abilify), with no evident negative effects and potentially some positive effects, during his June 2022 admission to API.)

Ultimately, the court went through each *Sell* factor and explained why it was finding that each factor was met, and the court concluded that the State had met its burden of proving by clear and convincing evidence that R.A. should be involuntarily medicated under *Sell*.

This petition followed.

*Why we granted this petition*

In *Myers v. Alaska Psychiatric Institute*, a case involving involuntary medication in the civil commitment context, the Alaska Supreme Court recognized that psychotropic medication can have "profound and lasting negative effects on a patient's mind and body."[14] The supreme court then held that "[g]iven the nature and potentially devastating impact of psychotropic medications" and "the broad scope of the Alaska Constitution's liberty and privacy guarantees," a person's right to refuse to take psychotropic drugs is "fundamental" under the Alaska Constitution.[15] The supreme court further held that "[w]hen no emergency exists . . . the state may override a mental patient's right to refuse psychotropic medication only when necessary to advance a compelling state interest and only if no less intrusive alternative exists."[16]

The constitutionally protected nature of an individual's right to refuse antipsychotic medication is also recognized in federal constitutional law. As the United States Supreme Court emphasized in *Washington v. Harper*, "The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty."[17] That interference is "particularly severe" in the case of

---

[14] *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 246 (Alaska 2006).

[15] *Id.* at 248.

[16] *Id.*

[17] *Washington v. Harper*, 494 U.S. 210, 229 (1990).

involuntary medication with antipsychotic drugs.[18] Because an individual "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment," the United States Supreme Court has required "a finding of overriding justification and a determination of medical appropriateness" before an involuntary medication order may be issued.[19]

In *Sell v. United States*, the United States Supreme Court addressed the question of whether, and under what circumstances, a court can order the involuntary medication of an incompetent criminal defendant solely to restore the defendant to competency.[20] The Court noted that, before involuntary medication to restore competency is considered, courts should ordinarily first determine whether the government "seeks, or has first sought, permission for forced administration of drugs" on other grounds — "such as the purposes set out in [*Washington v.*] *Harper* related to the individual's dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his health gravely at risk."[21] According to the Court, "If a court authorizes medication on these alternative grounds, the need to consider authorization on trial competence grounds will likely disappear."[22]

As discussed previously, the *Sell* Court articulated a four-part test that must be met before a court can order involuntary medication solely to restore an incompetent criminal defendant to competency: (1) there must be an "important"

---

[18]    *Riggins v. Nevada*, 504 U.S. 127, 134 (1992).

[19]    *Harper*, 494 U.S. at 221-22; *Riggins*, 504 U.S. at 135.

[20]    *Sell v. United States*, 539 U.S. 166 (2003).

[21]    *Id.* at 182.

[22]    *Id.* at 183; *see In re Linda M.*, 440 P.3d 168, 173 (Alaska 2019) (holding that *Sell* does not require "consolidation of criminal and civil mental health proceedings in a single court," and, in fact, "strongly impl[ies] its approval of the 'separate, confidential civil proceeding' that [the defendant] argue[d was] inconsistent with *Sell*").

government interest at stake; (2) involuntary medication must "significantly further" that interest; (3) involuntary medication must be "necessary" to further that interest; and (4) administration of involuntary medication must be "medically appropriate."[23]

Under Alaska law, a *Sell* order is not a final order and there is therefore no immediate right to appeal.[24] But both parties have the right to petition for interlocutory review of a *Sell* order. In the current case, R.A. has petitioned for review under Alaska Appellate Rule 402(b)(1), which provides for interlocutory review when "[p]ostponement of review until appeal may be taken from a final judgment will result in injustice because of impairment of a legal right."[25] R.A. argues that immediate review of the *Sell* order is required because postponement of review will result in impairment of R.A.'s fundamental constitutionally protected right to refuse psychotropic medication. We agree that R.A. has fundamental constitutionally protected privacy and liberty interests that justify immediate appellate review of the superior court's order. We have therefore granted the petition in this case, and we now issue our decision in this published opinion that resolves some of the legal issues that *Sell* left unanswered.

*Our resolution of some of the legal issues that <u>Sell</u> left unanswered*

*The burden of proof*

The United States Supreme Court did not directly prescribe the State's burden of proof in *Sell*. But all of the federal and state courts that have addressed this

---

[23]   *Sell*, 539 U.S. at 180-81.

[24]   *See* Alaska R. App. P. 202(b) ("An appeal may be taken to the court of appeals from a final judgment entered by the superior court or the district court, in the circumstances specified in AS 22.07.020."); AS 22.07.020(e) (defining a "final decision" as "a decision or order, other than a dismissal by consent of all parties, that closes a matter in the superior court.").

[25]   Alaska R. App. P. 402(b)(1).

issue have held that the State must prove each *Sell* factor by clear and convincing evidence.[26]

Clear and convincing evidence is "evidence that is greater than a preponderance, but less than proof beyond a reasonable doubt."[27] As the Alaska Supreme Court has explained, "Clear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved."[28] The Alaska Supreme Court has also defined clear and convincing evidence as evidence establishing that something is "highly probable."[29]

We agree that a high standard of proof is needed in these cases given the importance of the liberty and privacy interests at stake. We note that in *Myers v. Alaska Psychiatric Institute*, the Alaska Supreme Court adopted the clear and convincing burden of proof standard for involuntary medication petitions in civil commitment

---

[26] *See, e.g.*, *United States v. Diaz*, 630 F.3d 1314, 1331-32 (11th Cir. 2011) (collecting cases and concluding that "[o]ther circuit courts that have considered this issue uniformly concluded that in *Sell* cases the government bears the burden of proof on factual questions by clear and convincing evidence"); *State v. Wang*, 145 A.3d 906, 916 (Conn. 2016) (adopting clear and convincing evidence standard of proof).

[27] *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 187 (Alaska 2009) (quoting *Buster v. Gale*, 866 P.2d 837, 844 (Alaska 1994)).

[28] *Id.* (quoting *Buster*, 866 P.2d at 844).

[29] *Adkins v. Collens*, 444 P.3d 187, 203 n.55 (Alaska 2019) (citing *In re Reinstatement of Wiederholt*, 89 P.3d 771, 772 n.6 (Alaska 2004)); *see also United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1228 (10th Cir. 2007) ("[Under *Sell*] the government establishes a fact by clear and convincing evidence only if the evidence 'place[s] in the ultimate [fact finder] an abiding conviction that the truth of its factual contentions are 'highly probable.' . . . This would be true, of course, only if the material it offered instantly tilted the evidentiary scales in the affirmative when weighed against the evidence . . . offered in opposition.'" (citations omitted)).

cases.[30] We believe that the same standard should apply under *Sell.* Accordingly, like the other jurisdictions to consider this issue, we now hold that the State must prove each *Sell* factor by clear and convincing evidence.

### *The definition of "substantially likely"*

To prove the second prong of the *Sell* test — that involuntary medication will "significantly further" the government's interests — the State must prove, by clear and convincing evidence, that administration of the proposed drugs is (1) "substantially likely to render the defendant competent to stand trial," and (2) "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense."[31] (It is worth noting that the second prong only involves side effects — such as slurred speech, tics, or sedation — that are likely to interfere with the defendant's presentation to the jury or the defendant's ability to assist counsel.[32] Concerns about other types of side effects — such as weight gain — are

---

[30] *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 254 (Alaska 2006).

[31] *Sell v. United States*, 539 U.S. 166, 180-81 (2003).

[32] *See Riggins v. Nevada*, 504 U.S. 127, 142-43 (1992) (Kennedy, J., concurring).

> The side effects of antipsychotic drugs may alter demeanor in a way that will prejudice all facets of the defense. Serious due process concerns are implicated when the State manipulates the evidence in this way. The defendant may be restless and unable to sit still. The drugs can induce a condition called Parkinsonism, which, like Parkinson's disease, is characterized by tremor of the limbs, diminished range of facial expression, or slowed movements and speech.
>
> . . . .
>
> These potential side effects would be disturbing for any patient; but when the patient is a criminal defendant who is going to stand trial, the documented probability of side effects seems to me to render involuntary administration of the drugs by prosecuting officials unacceptable absent a

otherwise addressed through the fourth prong, which requires the administration of the proposed drugs to be "medically appropriate."[33])

The United States Supreme Court did not define "substantially likely" in *Sell*. But many of the appellate courts that have affirmed *Sell* orders have done so based, in part, on testimony that there was a seventy percent or higher likelihood that the proposed medication would render the defendant competent to stand trial.[34] This has

showing by the State that the side effects will not alter the defendant's reactions or diminish his capacity to assist counsel.

*Id.*; *see also United States v. Moruzin*, 583 F. Supp. 2d 535, 549 (D.N.J. 2008).

[33] *Sell*, 539 U.S. at 181; *see also United States v. Ruiz-Gaxiola*, 623 F.3d 684, 704 (9th Cir. 2010) (explaining the difference between considering side effects under the second and fourth *Sell* prongs).

[34] *See, e.g.*, *United States v. Dillon*, 738 F.3d 284, 297 (D.C. Cir. 2013) (affirming in part because a study demonstrated that 73.3 percent of individuals with the same disorder as the defendant were restored to competency following the proposed medication regimen); *United State v. Diaz*, 630 F.3d 1314, 1332 (11th Cir. 2011) (affirming an order for involuntary medication when expert testimony included statistical studies demonstrating seventy-five to eighty-seven percent of patients with psychosis given antipsychotic medication were restored to competency); *United States v. Fazio*, 599 F.3d 835, 840-41 (8th Cir. 2010) (affirming an order for involuntary medication when the State's expert testified there was a "75 to 87 percent chance that the medications he recommended would make [the defendant] competent to stand trial"); *United States v. Green*, 532 F.3d 538, 553 (6th Cir. 2008) (concluding that expert testimony that there was more than a ninety percent likelihood the defendant would be restored to competency satisfied the "substantial likelihood" standard); *United States v. Bradley*, 417 F.3d 1107, 1115 (10th Cir. 2005) (affirming an order for involuntary medication when the expert witness testified that eighty percent of defendants in his facility were restored to competency through administration of psychotropic medication); *United States v. Gomes*, 387 F.3d 157, 161-62 (2d Cir. 2004) (affirming an order for involuntary medication when experts noted a "substantial probability" the defendant would be restored to competency, citing their facility's seventy percent success rate); *see also United States v. Rivera-Morales*, 365 F. Supp. 2d 1139, 1141 (S.D. Cal. 2005) (finding that it could not order forcible medication of the defendant in part because "a chance of success that is simply more than a 50% chance of success does not suffice to meet [the 'substantially likely'] standard"); *People v. McDuffie*, 50 Cal. Rptr. 3d 794, 799 (Cal. App. 2006) (reversing a court's *Sell* order in part because fifty to sixty percent likelihood of being restored to competency was determined insufficient under *Sell*).

led at least one state supreme court to conclude that "substantially likely" requires a likelihood of more than seventy percent.[35] In *State v. Barzee*, the Utah Supreme Court held that "the substantially likely standard requires that the chance for restoration to competency be great," and the court concluded that "[t]o the extent that such a likelihood can be quantified, it should reflect a probability of more than seventy percent."[36] The court likewise concluded that "in order for side effects to be considered substantially unlikely to interfere with a defendant's right to a fair trial, any side effect that would impede a defendant's ability to assist in her defense must have a very low rate of occurrence."[37]

But there are also a minority of courts that have held that "substantially likely" means only that the probability of restoration to competency is "more likely than not." In *State v. Wang*, for example, the Connecticut Supreme Court noted that its state statute permitted involuntary medication if the court found, by clear and convincing evidence, that "to a reasonable degree of medical certainty," involuntary medication of the defendant will render the defendant competent to stand trial.[38] The Connecticut court concluded that "a reasonable degree of medical certainty" meant that restoration to competency is only "more likely than not," and the court therefore adopted that standard for purposes of the second prong of the *Sell* test.[39]

---

[35]  *State v. Barzee*, 177 P.3d 48, 61 (Utah 2007).

[36]  *Id.*

[37]  *Id.*

[38]  *State v. Wang*, 145 A.3d 906, 915 n.7, 917 (Conn. 2016).

[39]  *Id.* at 917.

We have previously rejected the Connecticut court's reasoning, but we have only done so in an unpublished order.[40] We now take the time to explain further why we reject this approach for purposes of Alaska law, and why we now hold that the term "substantially likely" refers to a likelihood of significantly more than fifty percent.

In our view, the Utah Supreme Court is correct that the term "substantially likely" must be interpreted "in the context of the greater question that it is designed to address: whether the State's interest in a competent defendant will be *significantly* furthered through involuntary medication."[41] As the Utah court reasoned, viewing the term in context "leads . . . to the conclusion that 'substantially likely' requires the likelihood of restoration to be significant, rather than requiring merely 'some' likelihood of restoration."[42] Therefore, we agree that a finding that the likelihood of restoration to competency is only fifty percent is insufficient to qualify as a substantial likelihood of success.

We also agree that the two parts of the second prong of the *Sell* test — whether involuntary medication is "substantially likely" to restore the defendant to competency and whether the involuntary medication is "substantially unlikely" to cause side effects that will impair the fairness of the trial — should be interpreted consistently, and that they should mean significantly more than fifty percent and significantly less than fifty percent. Otherwise, a court could authorize involuntary medication in cases where there was almost a fifty percent chance of side effects that could render the trial unfair. In our view, such an outcome would be inconsistent with the reasoning in *Sell* and with Justice Kennedy's concurrence in *Riggins v. Nevada*, on which the *Sell* reasoning is partially based.

---

[40] *See Jude A. v. State*, Court of Appeals File No. A-14325 (Order dated Feb. 14, 2024).

[41] *Barzee*, 177 P.3d at 60.

[42] *Id.*

In his concurrence in *Riggins*, Justice Kennedy warned that side effects from the involuntary medication could impact the fairness of the trial, and the justice concluded that "elementary protections" required the State "in every case" to make a showing "that there is no significant risk that the medication will impair or alter in any material way the defendant's capacity or willingness to react to the testimony at trial or to assist his counsel."[43] This reasoning was cited approvingly by the *Sell* court,[44] and is consistent with our view that "substantially unlikely" means that the risk of such side effects must be significantly lower than fifty percent.

Lastly, we note that interpreting "substantially likely" to mean significantly more than a fifty percent chance of restoration to competency is in keeping with Alaska's more protective privacy and liberty rights, which have led the Alaska Supreme Court to conclude that the right to refuse unwanted antipsychotic medication is "fundamental" under the Alaska Constitution.[45]

In his briefing on petition, R.A. requests that we explicitly adopt the Utah Supreme Court's holding that "substantially likely" requires a probability of more than seventy percent. However, we are reluctant to do so for a number of reasons. First, as the Utah Supreme Court itself recognized, it is not clear that the likelihood of restoration to competency can always be quantified in terms of a particular percentage.[46] Nor is it clear that having such a requirement is necessarily advisable, given the danger that requiring a certain percentage may just lead to "tailoring" of the medical expert testimony.[47] While it is useful for medical experts in a *Sell* hearing to quantify, to the

---

[43]  *Riggins v. Nevada*, 504 U.S. 127, 141-43 (1992) (Kennedy, J., concurring).

[44]  *Sell v. United States*, 539 U.S. 166, 181 (2003).

[45]  *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 248 (Alaska 2006).

[46]  *See Barzee*, 177 P.3d at 61.

[47]  *See State v. Cantrell*, 179 P.3d 1214, 1221-22 (N.M. 2008) ("[W]e decline to assign a number or percentage to the level of certainty by which a judge must find these two

extent they can, a probabilistic likelihood that the proposed course of involuntary medication will render a particular defendant competent, it does not necessarily follow that the decision of whether to order involuntary medication should turn on the difference between certain percentage points.

Thus, although we reject the Connecticut court's assumption that "substantially likely" means only "more likely than not,"[48] we decline R.A.'s request to adopt seventy percent as the specific threshold that must be met before involuntary medication may be ordered under *Sell*. Instead, we hold that the likelihood of restoration to competency must be significantly more than fifty percent in order to qualify as substantial for purposes of the second prong of the *Sell* test.[49]

### *The standard of review*

In the civil commitment context, a trial court's order authorizing involuntary medication is treated as a mixed question of fact and law.[50] The appellate court reviews the trial court's factual findings for clear error and reverses those findings only if the appellate court has a "definite and firm conviction that a mistake has been made."[51] However, whether those findings meet the statutory requirements for

---

elements because we wish to avoid, to the extent possible, tailored expert testimonies. . . . If we were to place that responsibility on experts, the result would likely be testimony contoured to our formal requirements but lacking in substance. We prefer that judges interpret meaningful medical testimony in the context of the applicable legal standards.").

[48]   *State v. Wang*, 145 A.3d 906, 917 (Conn. 2016).

[49]   *See, e.g.*, *People v. McDuffie*, 50 Cal. Rptr. 3d 794, 799 (Cal. App. 2006) (concluding that a fifty to sixty percent likelihood was insufficient under *Sell*); *see also supra* note 34 (collecting cases addressing whether the "substantially likely" requirement was satisfied).

[50]   *In re Naomi B.*, 435 P.3d 918, 923-24 (Alaska 2019).

[51]   *Id.* at 924 (quoting *In re Jacob S.*, 384 P.3d 758, 764 (Alaska 2016)).

involuntary medication is a question of law to which the appellate court applies its independent judgment.[52] This standard of review is well-established in the relevant Alaska Supreme Court case law.[53]

That case law strongly suggests that the same standard of review should apply to *Sell* orders — that is, to the trial court's ultimate decision whether to order involuntary medication in the competency context. But that case law does not necessarily answer the question of what standard of review should apply to each of the *Sell* factors.

Courts in other jurisdictions have uniformly treated the first *Sell* factor — whether there is an important governmental interest at stake — as a question of law.[54]

---

[52] *Id.* at 923-24.

> In order to administer psychotropic medication without a patient's consent, the State must also show by clear and convincing evidence "that no less intrusive alternative treatment is available." Determining whether a less intrusive alternative exists involves both "a balancing of legal rights and interests" and a factual inquiry into alternative treatments. The legal balancing weighs "the fundamental liberty and privacy interests of the patient against the compelling state interest under its *parens patriae* authority to 'protect "the person and property" of an individual who lack[s] legal age or capacity.'" This is intertwined with the factual assessment of "the feasibility and likely effectiveness of a proposed alternative." A proposed alternative "must actually be available, meaning that it is feasible and would actually satisfy the compelling state interests that justify the proposed state action."

*Id.* at 935-36 (citations omitted).

[53] *See, e.g., id.*; *In re Dominic N.*, __ P.3d __, 2024 WL 1819588, at *3 (Alaska Apr. 26, 2024); *In re Tonja P.*, 524 P.3d 795, 800 (Alaska 2023); *In re Mark V.*, 501 P.3d 228, 234 (Alaska 2021); *In re Rabi R.*, 468 P.3d 721, 730 (Alaska 2020); *In re Linda M.*, 440 P.3d 168, 171 (Alaska 2019); *Jacob S.*, 384 P.3d at 763-64; *In re Tracy C.*, 249 P.3d 1085, 1089 (Alaska 2011).

[54] *United States v. Green*, 532 F.3d 538, 546 (6th Cir. 2008) (collecting cases and agreeing that the first *Sell* factor is a legal conclusion that is reviewed *de novo*); *see also United States v. Evans*, 404 F.3d 227, 236 (4th Cir. 2005) (observing that whether the

But courts are not uniform as to whether the remaining *Sell* factors are predominantly questions of fact or of law.[55]

We conclude that we need not resolve this question in this case because we conclude that the State met its burden of proving the second *Sell* factor under either a clearly erroneous or a *de novo* review.

*Why we affirm the superior court's <u>Sell</u> order*

As already explained, before a trial court may issue an order involuntarily medicating a criminal defendant in an effort to restore them to competency, the State must prove (and the court must find) by clear and convincing evidence the following four-part test: (1) there are "*important* governmental interests at stake"; (2) "involuntary medication will *significantly further* those concomitant state interests" in that "administration of the drugs is substantially likely to render the defendant competent to stand trial" and "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense"; (3) "involuntary medication is *necessary* to further those interests," *i.e.*, "any alternative, less intrusive treatments are unlikely to achieve substantially the same

---

government's interest is "important" is a legal question it reviews *de novo*, although it reviews for clear error any factual findings relevant to that determination).

[55] *Compare United States v. Dillon*, 738 F.3d 284, 291 (D.C. Cir. 2013) (citing cases and agreeing with the majority of courts that the second, third, and fourth *Sell* factors are questions of fact), *and State v. Wang*, 145 A.3d 906, 915-916 (Conn. 2016) (noting that although the meaning of "substantially likely" is a legal question, whether the government has satisfied that legal standard is a question of fact reviewed for clear error), *with United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1224 (10th Cir. 2007) (reviewing the second *Sell* factor *de novo*), *and State v. Cantrell*, 179 P.3d 1214, 1221 (N.M. 2008) (reviewing the second *Sell* factor as a mixed question of law and fact).

results"; and (4) "administration of the drugs is *medically appropriate, i.e.*, in the patient's best medical interest in light of [their] medical condition."[56]

In the current case, R.A. does not dispute that the first, third, and fourth factors have been met. That is, R.A. acknowledges that the State has an "important governmental interest" in prosecuting him for the alleged murder of his mother, and he does not argue that there are any "special circumstances" that would undermine that interest. R.A. also acknowledges that there are no less intrusive treatments that would be likely to restore him to competency. And R.A. does not directly dispute that administration of the prescribed course of antipsychotic medication is in his best medical interest.

R.A. challenges, however, the superior court's findings under the second *Sell* factor. R.A. attacks the superior court's findings on the second *Sell* factor on three different grounds.

First, R.A. argues that the superior court failed to make "the necessary findings" to support the second *Sell* factor. R.A. criticizes the superior court for adopting the State's proposed findings wholesale and he argues that the court failed to conduct its own independent analysis. But as the State points out, there is nothing improper about what the superior court did here — creating an oral record of the relevant testimony and the parties' arguments and then directly adopting the State's proposed findings. The court's recounting of the facts was extensive and its analysis demonstrated a proper understanding of the legal standards that the State was required to meet. Although the court ultimately adopted the State's proposed findings from its written closing argument, the record is clear that the court did not simply defer to the State's arguments or otherwise abdicate its responsibility to make an independent assessment of the facts. Accordingly, we reject this first claim of error.

---

[56] *Sell v. United States*, 539 U.S. 166, 180-81 (2003).

Second, R.A. argues that the superior court erred in failing to reconcile the differences between the State's arguments and the conclusions of the *Sell* report jointly authored by Dr. Kane and Dr. Sawyer. R.A. points out that the legal standard requires the State to prove that involuntary medication is "substantially likely" to restore the defendant to competency, but the report stated only that it was the doctors' "reasonable expectation" that involuntary medication would restore R.A. to competency. R.A. argues that there is a difference between "reasonable expectation" and "substantially likely," and he asserts that the superior court erred because it did not acknowledge, or reconcile, that difference.

But the problem with this argument is that it was never raised or argued in the proceedings below. That is, neither Dr. Kane nor Dr. Sawyer were questioned about their use of "reasonable expectation" in their report, and they were not asked to explain whether there was any difference between that standard and the "substantially likely" standard that they both later testified to. On appeal, the State argues that "a reasonable expectation" is synonymous with a "substantial likelihood" and that both terms mean something "significantly more" than a fifty percent probability. We are not necessarily convinced that the two standards are identical, but we conclude that any erroneous use of "reasonable expectation" as the standard in the report was rendered harmless by virtue of both Dr. Kane and Dr. Sawyer later testifying at the evidentiary hearing that there was a substantial likelihood that R.A. would be rendered competent by the prescribed course of treatment. Accordingly, we find no error.

Lastly, R.A. argues that the superior court made a factual error that he claims directly affected the reliability of the court's findings on the second and fourth *Sell* factors. At the evidentiary hearing, Dr. Sawyer testified (incorrectly) that she believed that R.A. had taken olanzapine (Zyprexa) during one of his API visits. Dr. Sawyer further testified that R.A. did not appear to have any negative side effects from that experience. In its oral ruling, the superior court implied R.A. had taken at least one of the medications Dr. Sawyer was recommending without negative effect and

potentially with some positive reaction. In so stating, the court appears to have conflated Dr. Sawyer's incorrect testimony with Dr. Kane's correct testimony that R.A. had previously taken *a* medication without noted negative effects and some positive impact. In reality, as Dr. Kane testified, the drug that R.A. took with no recorded negative effects and some potentially positive effect was aripiprazole (Abilify), not olanzapine (Zyprexa), as Dr. Sawyer erroneously claimed.

On appeal, R.A. argues that this Court should vacate the superior court's *Sell* order based on this factual error. But we agree with the State that the error was of limited significance given the larger context of the doctors' testimony. Both doctors were clear that the most salient fact about R.A.'s past treatment with antipsychotic medication was that he had never been on medication for any lengthy period of time. The doctors' predictions as to how he would tolerate the proposed medication was instead based primarily on the doctors' experiences with other patients who were similarly situated to R.A. in terms of age, symptoms, and diagnosis.

Thus, contrary to R.A.'s arguments on appeal, the superior court did not order involuntary medication because it erroneously believed that R.A. had a positive response to one of the prescribed medications. Instead, the court ordered involuntary medication under *Sell*, knowing that R.A. did not have much of a track record with any of the proposed medications. We therefore conclude that the superior court's factual error regarding R.A.'s past use of olanzapine (Zyprexa) does not undermine the court's ultimate conclusion, based on all of the testimony it heard and evidence it received, that the State had met its burden of proving all four factors of the *Sell* test.

*Conclusion*

The *Sell* order of the superior court is AFFIRMED.